UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Dmitry Volovik,

Plaintiff,

v.

Civ. No. 01-1426 (JNE/JGL)
ORDER

Bayer Corporation,

Defendant.

---

Thomas Hamlin, Esq., Katie Crosby Lehmann, Esq., and Christopher Sorenson, Esq., Robins, Kaplan, Miller & Ciresi L.L.P., appeared for Plaintiff Dmitry Volovik.

Dale Heist, Esq., and Michael Bonella, Esq., Woodcock Washburn LLP, and Craig Diviney, Esq., Dorsey & Whitney LLP, appeared for Defendant Bayer Corporation.

---

This is a patent infringement action by the owner of a patent, Dmitry Volovik, against Bayer Corporation. The matter is before the Court on Bayer's Motion for Summary Judgment.[1] For the reasons set forth below, the Court denies the motion.

## I. BACKGROUND

Volovik is the owner of United States Patent No. 5,540,562 ('562 Patent), which relates to a fluid displacement pump. The '562 Patent issued on July 30, 1996, from an application filed by the inventor, Gershon Giter, on April 28, 1994. Volovik claims that Bayer's Centaur Immunoassay System contains pumps that infringe Claim 1 of the '562 Patent. Bayer now moves for summary judgment, arguing that Claim 1 is invalid because it was anticipated by prior art references.

---

[1] A motion by Bayer to exceed the 35-page limitation imposed by D. Minn. R. 7.1(c), is also before the Court. The Court grants this motion.

FILED MAY 1 2 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A patent is presumed valid. 35 U.S.C. § 282 (2000). To overcome this presumption, a party must prove facts that support a determination of invalidity by clear and convincing evidence. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002); *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 20 (Fed. Cir. 2000). Under 35 U.S.C. § 102 (2000), a patent claim is invalid due to anticipation if each element of the claim is found in a single prior art reference. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). A court determines whether prior art anticipates a claim by construing the claim and then comparing the construed claim to the prior art. *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1346 (Fed. Cir. 2002). Claim construction is a question of law, *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003), and the comparison of the construed claim to the

prior art presents questions of fact, *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998).

**A. Construction of Claim 1 of the '562 Patent**

In construing a claim, a court must first consider the intrinsic evidence of record—that is, the language of the claim itself, the specification, and the prosecution history, if in evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The analysis begins with the language of the claim, and there is a heavy presumption that the language is given its ordinary meaning as understood by one of ordinary skill in the art. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003). After identifying the claim's plain meaning, the court must examine the specification and the prosecution history to determine whether the patentee explicitly defined a term contrary to its ordinary meaning, disclaimed subject matter, or otherwise limited the scope of the claim. *Day Int'l, Inc. v. Reeves Bros.*, 260 F.3d 1343, 1348 (Fed. Cir. 2001).

Claim 1 of the '562 Patent states:

A fluid displacement pump, comprising:

(a) a housing, having a top wall, bottom wall, and side wall, the bottom wall and side wall each having an inner surface, the top wall, bottom wall, and side wall enclosing an interior therebetween,

(b) means in the inner surface of the side wall for carrying a seal therein,

(c) an elongated chamber, formed by the inner surface of the bottom wall, inner surface of the side wall, and the seal, having a piston reciprocally mounted therein, the piston sliding through the seal,

(d) means for accurately positioning the piston within the chamber so as to measure a fluid displacement, wherein the positioning means further comprises a stepper motor and a lead screw, and

(e) two ports for aspirating and dispensing fluid from the chamber

> wherein the positioning means is substantially axially aligned with the piston and chamber.

Use of the word "comprising" as a transitional phrase creates a presumption that the body of Claim 1 is open, meaning "that the recited elements are only a part of the device, [and] the claim does not exclude additional, unrecited elements." *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).

*1. Housing*

The first element of Claim 1 is a "housing." The ordinary meaning of "housing" is a case or enclosure that covers or protects another structure. The language of the element itself, "the top wall, bottom wall, and side wall enclosing an interior therebetween," and the specification figures are consistent with this meaning, and the prosecution history does not reveal a definition contrary to it. Accordingly, the Court construes "housing" to mean a case or enclosure that covers or protects another structure.

*2. Means for Carrying a Seal*

The second element of Claim 1 is "means in the inner surface of the side wall for carrying a seal therein." Use of the word "means" in a claim limitation gives rise to a presumption that 35 U.S.C. § 112(6) (2000), applies to its interpretation. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997). Section 112(6) provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The presumption falls away in two situations: (1) when an element does not recite a function corresponding to the means, or (2) when the element recites structure sufficient to perform the

function in its entirety. *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999).

In this case, the second element of Claim 1 of the '562 Patent states that the function of the means is to carry a seal, and does not recite sufficient structure performing that function. Thus, section 112(6) applies, *see Rodime*, 174 F.3d at 1302, and the Court must identify the corresponding structure in the patent specification for performing the function of carrying a seal, *See Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000). The specification states that "[t]he inner surface 24 of the side wall 20 has an annular means or groove 26 in which a seal 28 is mounted." '562 Patent, col. 2, ll. 38-40. Accordingly, the Court construes the means of the second element to be an annular groove and equivalents thereof.

*3. Seal*

The ordinary meaning of "seal" is a device that joins two parts so as to prevent leakage. Figure 2 of the '562 Patent specification is consistent with this meaning of a seal. It displays a seal extending from the side wall to the piston. The prosecution history does not contain a definition contrary to the ordinary meaning. Accordingly, the Court construes "seal" as a device that joins two parts so as to prevent leakage.

*4. Chamber and Piston*

The third element of Claim 1 is an elongated chamber. The element defines the chamber as formed by the inner surface of the bottom wall, the inner surface of the side wall, and the seal. The patent specification is consistent with the claim language, and the patent prosecution does not reveal a contrary definition. Accordingly, the Court construes the chamber to be a space in the interior of the housing that is formed by the inner surface of the bottom wall, the inner surface of the side wall, and the seal.

The third element also states that the chamber has "a piston reciprocally mounted therein, the piston sliding through the seal." The ordinary meaning of "piston" is a sliding part moved by or moving against fluid pressure. The specification is consistent with this meaning, describing the piston as being "driven and accurately positioned longitudinally within the chamber" by a stepper motor and lead screw. '562 Patent, col. 2, ll. 46-50. The specification figures are consistent with the ordinary meaning, and the patent prosecution does not reveal a contrary definition. Accordingly, the Court construes "piston" to be a sliding part moved by or moving against fluid pressure.

5. *Means for Accurately Positioning the Piston*

The fourth element of Claim 1 is "means for accurately positioning the piston within the chamber." Because the element uses the word "means," section 112(6) presumably applies. *See Sage Prods.*, 126 F.3d at 1427. The element states that the function of the means is to accurately position the piston within the chamber so as to measure a fluid displacement. The parties dispute whether the element recites sufficient structure for performing the function so as to render section 112(6) inapplicable.

The fourth element recites some structure for performing the positioning function by stating that the "positioning means further comprises a stepper motor and a lead screw." This clause discloses two parts of the positioning means, but they are not sufficient to perform the function in its entirety. Indeed, use of the word "comprises" suggests that the stepper motor and the lead screw are not sufficient structure. *Cf. Altiris*, 318 F.3d at 1376 ("The claim language uses 'including'—an open term—which suggests that the two sets of 'commands' are not sufficient structure; rather, something else is needed."). Bayer points to the final clause of Claim 1, "wherein the positioning means is substantially axially aligned with the piston and chamber,"

to impart additional structure to the positioning means. The clause reveals the relative location of the positioning means, but it does not disclose additional structure of the positioning means. For these reasons, the Court concludes that the presumption that section 112(6) applies has not been rebutted. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.3d 1533, 1536 (Fed Cir. 1991) ("The recitation of some structure in a means plus function element does not preclude the applicability of section 112(6).").

Having determined that section 112(6) applies, the Court must identify the corresponding structure in the patent specification for performing the function of accurately positioning the piston within the chamber so as to measure a fluid displacement. *See Kemco Sales*, 208 F.3d at 1360. The specification describes the positioning means: "The piston 38 is driven and accurately positioned longitudinally within the chamber 32 by a positioning means 40. In the preferred embodiment, the positioning means 40 comprises linear actuator or a stepper motor 42 and a lead screw 44, the lead screw being connected to the piston 38." '562 Patent, col. 2, ll. 46-50. Figure 2 displays the stepper motor on the outer surface of the top wall, the lead screw extending into the chamber, and the piston connected to the lead screw. Based on the specification, the Court construes the means of the fourth element as comprising a stepper motor and a lead screw that is connected to the piston, and equivalents thereof.

6. *Stepper Motor*

The ordinary meaning of "stepper motor" is a motor that rotates in short and essentially uniform angular movements rather than continuously. Neither the patent specification nor the prosecution history reveals a different definition. The Court therefore construes stepper motor in accordance with its ordinary meaning.

7. *Lead Screw*

The ordinary meaning of "lead screw" is a threaded shaft used to convert rotation to longitudinal motion. The patent figures are consistent with this meaning, displaying the lead screw as a threaded shaft. Relying on the prosecution history, Volovik claims that the inventor, Giter, defined "lead screw" as a finely threaded rod with a nut other than a ball nut.

It is well established that the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003). An inventor's statements distinguishing the claimed invention from prior art acts as a disclaimer by revealing what the claimed invention does not cover. *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997). A disclaimer must reasonably clear and deliberate. *Springs Window Fashions*, 323 F.3d at 994; *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1294-95 (Fed. Cir. 2000).

In this case, the examiner rejected Giter's application for the '562 Patent because United States Patent 4,566,868 (Menzies) "teaches driving a piston with a rotary stepper motor, threaded piston rod 20, and ball screw 17." Giter responded:

> Menzies does not disclose a lead screw. There is no disclosure in Menzies that the ball screw 17 is capable of the fine gradations in linear movement which [Giter's] lead screw provides. It is well known in the art that lead screws may be made with extremely fine pitch, which would provide [Giter's] invention with very precise control of the longitudunal position of the piston 38, which is required for accurate dispensing of very tiny volumes.

The examiner rejected Giter's argument, stating that the "[t]hreaded rod 20 [in Menzies] is read as the lead screw." Giter appealed the examiner's rejection of his application. On appeal, he raised several arguments relating to Menzies, including:

> Menzies [does not] disclose[] a lead screw. . . . [T]here is no indication that the ball screw 17 of Menzies is equivalent to a lead screw. There is no disclosure in

> Menzies that the ball screw 17 is capable of the fine gradations in linear movement which [Giter's] lead screw provides.

Giter also argued that Menzies was non-analogous prior art, and that there was no suggestion to combine Menzies with another prior art reference relied on by the examiner. The examiner allowed the claims in light of the arguments Giter presented on appeal.

The prosecution history does not support Volovik's proposed construction of lead screw. Giter distinguished Menzies based on the ability to perform fine gradations of linear movement. Giter's assertion that there is "no indication" that Menzies' ball screw is equivalent to a lead screw falls far short of a reasonably clear and deliberate disclaimer of the use of a ball nut in the '562 Patent. The Court therefore rejects Volovik's contention that Giter defined "lead screw" to exclude use of a ball nut, and construes the term as a threaded shaft used to convert rotation to longitudinal motion.

8. *Ports*

The fifth element of Claim 1 is "two ports for aspirating and dispensing fluid from the chamber." The ordinary meaning of "port" is an opening. The specification and figures are consistent with the ordinary meaning, and the prosecution history does not contain a contrary definition. Accordingly, the Court construes "port" to be an opening.

9. *Axial Alignment*

The ordinary meaning of axial alignment is the positioning of components such that their centerlines fall on the same line. The patent figures confirm this meaning, and the prosecution history does not contain a contrary definition. The Court therefore construes axial alignment in accordance with its ordinary meaning.

**B. Comparison of Claim 1 of the '562 Patent to Prior Art**

Bayer contends that three prior art references that were not evaluated by the Patent and Trademark Office during the prosecution of the '562 Patent—United States Patent 5,637,208 (Dourdeville), United States Patent 4,536,471 (Clark '471), and United States Patent 5,253,981 (Yang)—anticipate Claim 1.[2] Volovik argues that neither Dourdeville nor Clark '471 is prior art to the '562 Patent, and that none of the references relied on by Bayer include each element of Claim 1 of the '562 Patent.

*1. Dourdeville*

Dourdeville is effective as prior art as of March 5, 1993, pursuant to 35 U.S.C. § 102(e). *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1365 (Fed. Cir. 2001). To remove Dourdeville as prior art, Giter must have either reduced the invention to practice before March 5, 1993, or conceived of the invention before that date, and diligently reduced it to practice thereafter. *See* 35 U.S.C. § 102(g); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576-78 (Fed. Cir. 1996).

An invention is conceived when the inventor forms a definite and permanent idea of the complete and operative invention as it is to be applied in practice. *Brown v. Barbacid*, 276 F.3d 1327, 1335-36 (Fed. Cir. 2002). The idea must encompass all limitations of the invention. *Id.* at 1336. A party seeking to show conception through the inventor's oral testimony must corroborate that testimony by independent evidence. *Id.* at 1335. A "rule of reason" applies to determine whether there has been sufficient corroboration. *Id.*

---

[2] In its memorandum, Bayer asserted that two other prior art references—Japanese patent application 2-213729 and United States Patent 5,358,691—anticipate Claim 1. At the motion hearing, Bayer conceded that summary judgment based on these references was inappropriate.

Giter submitted a declaration in opposition to Bayer's motion describing his conception of the invention and its reduction to practice. According to Giter, he conceived of the invention in October 1992. He then used rough sketches to make "basic layouts." By December 1992, he started to produce detailed engineering drawings. He obtained quotes and purchased parts for prototypes from December 1992 through March 1993. In April or May 1993, Giter assembled and tested the prototypes. By the end of June 1993, he had built a working prototype and completed testing.

Volovik relies on the basic layouts, engineering drawings, requests for quotes, purchases of parts, a bill of material, and his own declaration to corroborate Giter's declaration that Giter conceived of the invention in October 1992. The basic layouts are not dated and the only evidence dating them comes from Giter. The engineering drawings are dated December 1992 and were revised into August and November 1993. On December 14, 1992, Giter received a quote for a stepper motor from Philips Technologies. From December 1992 through March 1993, Giter requested and received quotes for seals from Bal Seal Engineering Company. The bill of material was created on January 3, 1993, and lists parts corresponding to all elements of the invention. On March 17, 1993, Giter received a quote from Tolerance Masters Inc. In March 1993, additional engineering drawings were prepared. On March 25, 1993, Giter submitted a purchase order to National Precision Tool Co. for parts, including the base, barrel, piston, retainer, adapter piston, and cap. In his declaration, Volovik states he witnessed Giter obtain parts for the '562 invention, including the metal housing and seals. None of this evidence corroborates Giter's statement that he conceived of the invention in October 1992, because the evidence is either undated or dated no earlier than December 1992. It does, however, support that proposition that he conceived of the invention no later than January 3, 1993, the date of the

bill of material. *See Price v. Symsek*, 988 F.2d 1187, 1196 (Fed. Cir. 1993). Viewing the record in the light most favorable to Volovik, the Court concludes that a rational trier of fact could find that Giter conceived of the invention by that date.

Having determined that Volovik submitted sufficient evidence to demonstrate Giter's conception of the invention before the effective date of Dourdeville, the Court will consider whether Giter diligently reduced the invention to practice. To establish reduction to practice, the inventor must have "constructed an embodiment or performed a process that met all limitations of the claim, and . . . determined that the invention would work for its intended purpose." *Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1265 (Fed. Cir. 2002). Depending on the character of the invention and the problem it solves, testing of the invention may be required to determine whether the invention works. *Id.* A party seeking to establish reduction to practice by the inventor's testimony must provide independent corroborating evidence. *Id.* The sufficiency of corroborating evidence is evaluated under a "rule of reason," and all pertinent evidence must be considered. *Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.*, 266 F.3d 1358, 1363 (Fed. Cir. 2001).

To corroborate Giter's declaration that he built a working prototype and completed testing by the end of June 1993, Volovik relies on the engineering drawings, Giter's purchases of parts in early 1993, promotional materials prepared in June 1993, and Volovik's own declaration. As already discussed, Giter purchased parts for the invention in early 1993, and Volovik saw him obtain them. Giter showed Volovik a prototype in June 1993. That month, promotional materials for the pump were prepared, including a photograph of the pump taken on June 18, 1993. The promotional materials tout the precision and reliability of the pumps.

Bayer asserts this evidence is insufficient to corroborate Giter's declaration that he reduced the invention to practice in June 1993. Bayer asserts Volovik cannot corroborate the reduction to practice because he testified at his deposition that he knew nothing about the pump's structure in June 1993. The Court does not find Bayer's argument persuasive. Volovik's deposition testimony reiterates the statement in his declaration that he saw a prototype in June 1993. Volovik's observation of a prototype at that time corroborates Giter's declaration. The Court need not decide whether Volovik's declaration and testimony are sufficient by themselves to corroborate Giter's declaration because, as previously mentioned, the record contains additional corroborating evidence.

Bayer next argues that there is no corroboration of Giter's assertion that, by June 1993, he had completed testing that established the suitability of the pump. According to Bayer, Giter's deposition testimony establishes that testing was required to determine the pump worked:

Q: Now, in paragraph 36 of your declaration . . . you talk about testing.

A: Correct.

Q: Was testing required for you to establish that your pump was suitable for aspirating and dispensing sample, reagent and diluent in medical laboratory and process instrumentation?

A: Let me just read the paragraph. You are referring to paragraph 36?

Q: Yes.

A: (Reviewing.) Yes. That was the intent of the testing.

Bayer contends there is no evidence in the record of test results or other independent evidence establishing the suitability of the invention for its intended purpose.

Assuming Giter's deposition testimony establishes the necessity of testing, the lack of test results in the record does not preclude Volovik from corroborating Giter's declaration. In

*Loral Fairchild*, a patentee relied on the inventor's affidavit, testimony from one of the inventor's co-workers, and a proposal submitted to the United States Air Force to establish the invention's reduction to practice. 266 F.3d at 1363. The co-worker saw the inventor receive material for the invention, and the proposal stated that "the claimed process 'is already showing reliable performance and high yield.'" *Id.* The Federal Circuit held that this evidence was sufficient to establish reduction to practice, and that documentation of test results was unnecessary:

> Here, [the inventor's] alleged reduction to practice is not corroborated by *documentary* evidence of *test results* confirming process performance. It is, however, corroborated by the testimony of [the co-worker], the delivery date of the masks necessary to practice the invention, and the Air Force Proposal. . . . [The patentee] has presented corroborating testimony by a co-worker of the inventor, and has demonstrated that material necessary to practice the invention was obtained prior to the alleged reduction to practice. And more, the district court's insistence upon "documentary evidence" to corroborate test results of [the inventor's] claimed reduction to practice was erroneous as a matter of law. Under the "rule of reason," the inventor's testimony must be sufficiently corroborated by independent evidence, but not necessarily *documentary* evidence. . . .
>
> To avoid summary judgment, [the patentee] needed only to show that [the inventor] asserted reduction to practice . . . and to provide the corroborating evidence required under this court's precedent. It did so.

*Id.* at 1364 (citations and footnote omitted).

In this case, Giter asserted that he diligently reduced the invention to practice after its conception. By the end of June 1993, Giter built a working prototype and determined that it would work for its intended purpose. Giter's purchase of parts in early 1993, Volovik's observations of the prototype in June 1993, and the preparation of promotional materials that same month corroborate Giter's declaration that he reduced the invention to practice by the end of June 1993. Based on this evidence, a rational trier of fact could find that he diligently reduced the invention to practice.

In sum, there are genuine issues of fact as to whether Giter conceived of the invention before Dourdeville's effective date, and whether he diligently reduced it to practice. The Court therefore denies Bayer's motion insofar as it relies on Dourdeville.

*2. Clark '471*

Bayer asserts that Clark '471 is effective as prior art as of January 3, 1994. The Court has already concluded that there are genuine issues of fact as to whether Giter conceived of the invention before that date, and whether he diligently reduced it to practice. The Court therefore denies Bayer's motion insofar as it relies on Clark '471.

*3. Yang*

Volovik argues that Yang does not anticipate Claim 1 of the '562 Patent because it does not include each element of Claim 1, including the positioning means. In support of his argument on this point, Volovik submitted an affidavit from William K. Durfee, a Professor in the Department of Mechanical Engineering at the University of Minnesota, which states that Yang's structure for positioning the piston is not equivalent to Claim 1's positioning means. Given the Court's application of section 112(6) to Claim 1's "means for accurately positioning the piston" element, Bayer concedes that Durfee's affidavit creates an issue of fact rendering summary judgment inappropriate. The Court therefore denies Bayer's motion insofar as it relies on Yang.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Bayer's Motion to Exceed Cumulative Page Limitation [Docket No. 95] is GRANTED.

2. Bayer's Motion for Summary Judgment [Docket No. 84] is DENIED.

Dated: May 12, 2003

JOAN N. ERICKSEN
United States District Judge