UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Dmitry Volovik,

Plaintiff,

v.

Civ. No. 01-1426 (JNE/JGL)
ORDER

Bayer Corporation,

Defendant.

---

Thomas L. Hamlin, Esq., and Katie Crosby Lehman, Esq., Robins, Kaplan, Miller & Ciresi L.L.P., appeared for Plaintiff Dmitry Volovik.

Gary H. Levin, Esq., Dale M. Heist, Esq., Albert J. Marcellino, Esq., and Michael J. Bonella, Esq., Woodcock Washburn LLP, and William A. Dossett, Esq., Dorsey & Whitney LLP, appeared for Defendant Bayer Corporation.

---

This is a patent-infringement case brought by Dmitry Volovik against Bayer Corporation. Several motions are before the Court: Volovik's motion for summary judgment on patent ownership and Bayer Corporation's affirmative defense of lack of standing; Bayer's motion for summary judgment on patent invalidity, or in the alternative, of non-infringement; Bayer's motion for summary judgment denying damages based on the entire market value rule; Bayer's motion in limine to preclude Volovik from submitting evidence related to royalty damages for alleged future injury; and Bayer's motion in limine to preclude Volovik from submitting evidence as to damages for any infringement prior to December 22, 1999. For the reasons set forth below, the Court grants some of the motions.

## I. BACKGROUND

Volovik is the holder of United States Patent No. 5,540,562 ('562 patent), which relates to a fluid displacement pump. Bayer is the owner of the Centaur Immunoassay System (the

FILED JAN 0 7 2004
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

Centaur System), which is a system used to test or assay patient samples, usually blood specimens, for the presence of analytes such as hormones, drugs, antibodies, or other markers of infection or disease. Volovik alleges that the Centaur System uses pumps that infringe claim 1 of the '562 patent.

Claim 1 of the '562 patent states:

A fluid displacement pump, comprising:

(a) a housing, having a top wall, bottom wall, and side wall, the bottom wall and side wall each having an inner surface, the top wall, bottom wall, and side wall enclosing an interior therebetween,

(b) means in the inner surface of the side wall for carrying a seal therein,

(c) an elongated chamber, formed by the inner surface of the bottom wall, inner surface of the side wall, and the seal, having a piston reciprocally mounted therein, the piston sliding through the seal,

(d) means for accurately positioning the piston within the chamber so as to measure a fluid displacement, wherein the positioning means further comprises a stepper motor and a lead screw, and

(e) two ports for aspirating and dispensing fluid from the chamber

wherein the positioning means is substantially axially aligned with the piston and chamber.

In October 2002, Bayer moved for summary judgment, contending that the '562 patent was invalid because it was anticipated by three prior art references. In an Order dated May 12, 2003, the Court construed nine terms found in claim 1 and denied Bayer's summary judgment motion because there were genuine issues of material fact as to whether Gershon Giter, the inventor of the patent, conceived of the invention and diligently reduced it to practice before the effective date of the prior art references in United States Patent 5,637,208 (Dourdeville) and United States Patent 4,536,471 (Clark '471) and as to whether United States Patent 5,253,981 (Yang) includes each element of claim 1 of the '562 patent. The Court did not reach the issue of

whether Dourdeville or Clark '471 include each element of claim 1 of the '562 patent.

## II. DISCUSSION

### A. Summary Judgment Motions

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

#### *1. Patent Ownership*

Because it is a threshold issue in this case, the Court addresses first the question of ownership of the '562 patent. Volovik moves for summary judgment, seeking to establish that he holds legal title to the '562 patent and to dismiss Bayer's affirmative defense of lack of standing.

A party seeking money damages for patent infringement must hold legal title to the patent alleged to be infringed. *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551-52 (Fed. Cir. 1995). The Patent Act provides that "a patentee shall have remedy by civil action for infringement of his

or her patent." 35 U.S.C. § 281 (2000). The term patentee includes "not only the patentee to whom the patent was issued by also the successors in title to the patentee." *Id.* § 100(d). A successor in interest can gain legal title to a patent only by way of a written agreement that expresses a patent owner's present intention to transfer title. *Id.* § 261 (noting that patents must be assigned by "an instrument in writing"); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580-81 (Fed. Cir. 1991) (discussing that legal title can be transferred only in an instrument that expresses a present intention to transfer an existing invention). To determine whether legal title has been transferred to a successor in interest, a court construes an assignment agreement according to state contract law. *See Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996).

The parties agree that the assignment agreements at issue should be construed according to Minnesota law. Under Minnesota law, no particular form of words is needed for a valid assignment. Instead, "an intent to transfer must be manifested and the assignor must not retain any control . . . or any power of revocation." *Guaranty State Bank of St. Paul v. Lindquist,* 304 N.W.2d 278, 280-81 (Minn.1980). Construction and effect of an unambiguous agreement raise questions of law. *Opus Corp. v. IBM*, 141 F.3d 1261, 1265 (8th Cir. 1998) (interpreting Minnesota law). In construing a contract, a court must allow the intent of the parties to prevail and avoid an interpretation that would render a provision meaningless. *Id.*

Volovik asserts that he obtained all substantial rights in the '562 patent by virtue of three written instruments: the 1994 assignment agreement between Giter and Ashirus Technologies, Inc. (Ashirus), a start-up company Giter founded (1994 Agreement); the 1997 Waiver, Release, and Separation Agreement (Waiver Agreement); and the 1998 Agreement for Sale of Collateral

(Agreement for Sale).[1] Bayer agrees that the 1994 Agreement was a valid transfer of title from Giter to Ashirus but disputes that the Waiver Agreement and Agreement for Sale were valid transfers of title.

*a. The Waiver Agreement*

Volovik asserts that the Waiver Agreement transferred title of the '562 patent from Ashirus to Reliable. In 1996, Ashirus defaulted on notes from several investors. To satisfy the debt, Ashirus entered into the Waiver Agreement dated March 25, 1997 with Giter and the investors, who had formed a company called Reliable Fluids, Inc. (Reliable). In the agreement, Ashirus surrenders to Reliable all of Ashrius's rights to its assets, including its rights to the '562 patent. The Waiver Agreement requires Ashirus to deliver any further documents needed to "carry out [its] purpose and intent" and states that Ashirus and Reliable "may amend" it to "establish other mutually agreeable terms for the transfer of the Surrendered Assets," provided that "any such mutual agreement . . . [would] not otherwise affect the binding nature of the other provisions" of the Waiver Agreement. In 1998, Randy Geissler, the only remaining director of Ashirus, signed various documents requested by Reliable that related to the assignment of the '562 patent.

*b. The Agreement for Sale*

Next, Volovik asserts that the Agreement for Sale transferred title of the '562 patent from Reliable to Volovik as of the effective date of the agreement. On July 23, 1998, Volovik and Reliable entered into the Agreement for Sale under Minn. Stat. 336.9-504 (1998). The Agreement for Sale provides that Reliable "agrees to sell, assign, transfer and convey to Volovik,

[1] Alternatively, Volovik argues that he gained title to the '562 patent through an agreement between Ashirus and Volovik. The Court finds this argument unpersuasive and denies Volovik's motion insofar as it relates to this theory.

on the Effective Date, . . . all of Ashirus' right, title and interest in and to the Collateral, including, to the extent the following constitute Collateral, all right, title and interest of Ashirus, if any, in and to [the '562 patent]." The effective date for the Agreement for Sale is defined as 14 days after Reliable notifies Volovik that it had received written approval from its shareholders. The effective date occurred on August 19, 1998. The Agreement for Sale requires Volovik to pay $60,000 to Reliable "as consideration for the collateral," with $15,000 payable on the effective date, $10,000 due within 12 months, and $35,000 due within 24 months. In exchange, Volovik agrees to grant Reliable a security interest in the Collateral "to secure payment of all amounts due or to become due." Volovik made the payments under the Agreement for Sale, with the last payment made on December 19, 1999.

In response to Volovik's arguments regarding the transfer of title, Bayer asserts that title did not transfer from Ashirus to Reliable under the Waiver Agreement for three reasons: (1) the agreement did not express a present intention of Ashirus to transfer title or of Reliable to accept title; (2) the later agreements by Geissler show that the parties were trying to transfer title after the Waiver Agreement was executed; and (3) there was no transfer of title under the U.C.C., which Minnesota has adopted. In addition, Bayer asserts that the Agreement for Sale did not transfer title of the '562 patent from Reliable to Volovik for two reasons: (1) Reliable could not transfer title to the patent because it never had title to the patent to transfer; and (2) there was no present sense transfer because the Agreement for Sale purports to transfer title as of the effective date of the agreement.

After reviewing the parties' memoranda, statements made at oral argument, and case law, the Court concludes that the main ownership disputes center around whether there was a present sense transfer in the Waiver Agreement and whether "agrees to sell, assign, transfer and convey"

as of the effective date was a present tense transfer in the Agreement for Sale. *Compare Arachnid*, 939 F.2d at 1580-81 (concluding that agreement was not a present sense transfer because it was an agreement to assign, not an assignment) *with Filmtec Corp. v. Allied Signal, Inc.*, 939 F.2d 1568 (Fed. Cir. 1991) (concluding that agreement "to grant and does hereby grant[s]" all rights to inventions, whether or not the invention was patentable, was a present sense transfer). A reasonable fact-finder could conclude that the Waiver Agreement did not transfer title from Ashirus to Reliable and that the Agreement for Sale did not transfer title from Reliable to Volovik. Accordingly, Volovik is not entitled to summary judgment with respect to his motion on patent ownership and Bayer's affirmative defense of lack of standing, and the Court denies Volovik's motion.

2. *Patent Invalidity*

a. *Patent Invalidity Due to Anticipation*

Under 35 U.S.C §102, Bayer moves for summary judgment, contending that there is no genuine issue of material fact that each element of claim 1 of the '562 patent is found in three references—the Abbott AxSym® pump, the Abbott Spectrum® pump, and the Beckman CX3® pump. A patent is presumed valid. 35 U.S.C. § 282 (2000). To overcome this presumption, clear and convincing evidence of invalidity is needed. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002). A patent is invalid if it is anticipated by a single prior art reference. 35 U.S.C. § 102 (2000). Specifically, a patent claim is invalid due to anticipation or lack of novelty if each element of a construed claim is found in a single prior art reference. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). Although anticipation presents a question of fact, a court may decide the issue on summary judgment if the record reveals that there is no genuine issue of material fact as to whether a prior art reference

anticipates a claim. *Telemac Cellular Corp. v. Topp Telecomm, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001). Summary judgment is improper, however, if there is "specific, plausible and detailed testimony by dueling expert witnesses" that creates a genuine issue of material fact. *Total Containment, Inc. v. Intelpro Corp.*, 1999 WL 717946 at *4 (Fed. Cir. 1999).

Bayer's makes its motion for invalidity due to anticipation under 35 U.S.C. §§ 102(b) and (g). Section 102 of the Patent Act sets forth the conditions for patentability relating to novelty, and it creates certain statutory bars related to the timeliness of a patentee's application. Sections 102(b) and (g) have different requirements with respect to timing, depending on the specific policies underlying the subsections. *See generally* Donald S. Chisum, *Patents*, § 3.01 (2003) (discussing differences among the provisions of section 102); *Levi Strauss & Co v. Golden Trade*, 1995 WL 710822 at * 16 (discussing anticipation under sections 102(a), (b), and (g)). Section 102(b), referred to as the on-sale bar, focuses on events that may have occurred more than 12 months prior to the filing of the inventor's patent application. *See In re Epstein*, 32 F.3d 1559, 1564 (Fed. Cir. 1994) (noting that the public use and on-sale bars are not limited to uses or sales by the inventor and instead can apply to activities by a third party that anticipate the invention). The issue of whether an invention was on-sale within the meaning of section 102(b) is a question of law based on underlying findings of fact, with the relevant inquiry focused on "whether there was a definite sale or offer for sale of the claimed invention prior to the critical date." *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1216 (Fed. Cir. 1998). The critical date for the on-sale bar is defined as one year prior to the United States filing date to which the application was entitled. *Id.* Because Giter filed the '562 patent application on April 28, 1994, the critical date for the on-sale bar in this case is April 28, 1993. Section 102(g) focuses on events that may have occurred prior to the invention date. *Id.* Under that section, a

person is not entitled to a patent if "before such person's invention thereof, the invention was made in this county by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g). As discussed in the May 2003 Order, Giter conceived of the invention no later than January 3, 1993. Thus, for the purposes of this motion, the critical date for section 102(g) is January 3, 1993.

*i. The Abbott AxSYM® Pump*

The parties agree that the AxSym® pump was conceived of and reduced to practice before the critical date. The parties disagree, however, about whether the AxSym® pump includes all of the elements of claim 1. The dispute centers around the second element of claim 1, which is a "means in the inner surface of the side wall for carrying a seal therein." In its May 2003 Order, the Court concluded that this element was a means-plus-function element under 35 U.S.C. § 112(6) and construed the means to be "an annular groove and equivalents thereof." Bayer asserts that the AxSym® pump contains this element or its equivalent, and Volovik contends that it does not.

Under section 112(6), to determine whether the AxSym® pump includes "an annular groove and equivalents thereof," the inquiry is limited to whether the "assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) (explaining differences between the doctrine of equivalence infringement analysis and equivalence under section 112(6)).

The AxSym® pump uses a backup O-ring, spring, and nut to hold the seal in place, and the seal is located, at least in part, in a groove in the side wall. Kendall Hendrick, Bayer's expert, opines that because the AxSym® pump has a groove that in some way holds or supports

the seal, it performs the identical function as the annular groove in the second element of claim 1. In response, Professor Durfee, Volovik's expert, opines that the way in which the seal is held in place in the AxSym® pump and the way in which the seal is held in place in claim 1 are not equivalent because they do not perform the claimed function (carrying the seal) in substantially the same way (in an annular groove) to achieve the substantially same result (keeping the seal stationary as the piston moves up and down). Durfee also notes that nowhere in the AxSym® pump's specifications or in the pump itself does it show that the seal is supported by an annular groove.

Viewing the evidence in the light most favorable to Volovik and considering the reports from the parties' expert witnesses, a reasonable fact finder could conclude that the AxSym® pump's backup O-ring, spring and a nut do not perform the same function in the same way as the annular groove in the second element of claim 1. As such, there is a genuine issue of material fact, and the Court denies Bayer's summary judgment motion with respect to whether the AxSym® pump anticipates claim 1 of the '562 patent.

*ii. The Abbott Spectrum® Pump*

The parties dispute whether the Spectrum® pump was in use or on sale prior to the critical date and whether the Spectrum® pump includes all of the elements of claim 1.

In July 1984, Abbott introduced the Spectrum® analyzer at a trade show that contained a pump referred to in this motion as the Spectrum® pump. By the beginning of 1985, Abbott had sold over one hundred Spectrum® analyzers that contained the Spectrum® pump, some of which were sold in the United States. According to Bayer, the Spectrum® pump sold during that time included all of the elements of the invention claimed in claim 1 of the '562 patent. To support these assertions, Bayer relies on the testimony of four Abbott witnesses—two engineers, one

consultant, and a sales and marketing person—to demonstrate that the pump was sold prior to April 28, 1993 and that the structure of that pump contained all of the elements of claim 1. Bayer offers documentary proof in the form of assembly and engineering drawings and a sample Spectrum® pump to show that the all of the elements of claim 1 were in the Spectrum® pump that was sold before the critical date.

In response, Volovik points out that Bayer's evidence is uncorroborated and incomplete in that there are no sales invoices to show that sales occurred prior to the critical date. He also argues that the engineering and assembly documents relied on by Bayer are either undated or not specific enough to show that all of the elements claimed by Bayer to be found in claim 1 were in the Spectrum® pumps sold prior to the critical date. In addition, Volovik notes that there is no way to know the manufacturing date of the Spectrum® pump produced during discovery, which is the same pump Bayer uses to demonstrate that all of the elements of claim 1 were anticipated by a Spectrum® pump.

The record reveals sales before the critical date. Abbott's sales and marketing person testified that there were sales in the United States of the Spectrum® pump in 1986 and 1987. This testimony is supported by sales and purchasing documentation from that time period. Moreover, the record reveals that the version of the Spectrum® pump sold prior to the critical date is the same version Bayer now claims to anticipate claim 1 of the '562 patent. Two Abbott engineers testified that the version of the Spectrum® pump sold prior to the critical date includes each element of claim 1. Viewing the evidence in the light most favorable to Volovik, the record reveals that Bayer has met its clear and convincing burden with respect to showing that a Spectrum® pump with all of the elements *alleged* by Bayer to anticipate claim 1 was on sale prior to the critical date.

Given this conclusion, the remaining issue with respect to the Spectrum® pump is whether it includes each element of claim 1 of the '562 patent. The Spectrum® pump uses a spring, sleeve and cap to carry its seal, and in this way, the Spectrum® pump is similar to the AxSym® pump. The parties agree that their arguments proffered with respect to anticipation and the AxSym® pump apply with equal force to the Spectrum® pump. Given that the Court has already concluded that there are genuine issues of material fact with respect to whether the AxSym® pump anticipates claim 1 of the '562 patent, the Court concludes that summary judgment with respect to the Spectrum® pump is also inappropriate. A reasonable fact finder could conclude that the Spectrum® pump's spring, sleeve and cap do not perform the same function in the same way as the annular groove in the second element of claim 1. Accordingly, the Court denies Bayer's summary judgment motion with respect to whether the Spectrum® pump anticipates claim 1 of the '562 patent.

*iii. The Beckman CX3® Pump*

The parties dispute whether the CX3® pump was in use or on sale prior to the critical date and whether the CX3® pump includes all of the elements of claim 1.

In the late 1980s, Beckman began selling a blood chemistry analyzer named the CX3® analyzer, which contained a pump referred to in this motion as the CX3® pump. Bayer asserts that a CX3® pump with all of the elements of claim 1 was sold prior to the critical date. To support this assertion, Bayer points to the testimony of Beckman's Rule 30(b)(6) witness, who was involved with purchasing components of the CX3® pump since the late 1980s, and of a former Beckman engineer, who designed the CX3® pump. Both witnesses testified about what features were included in the CX3® pump sold prior to April 28, 1993, and both agreed that the sample CX3® pump produced during discovery was representative of the pumps sold prior to the

critical date. Bayer also points to corroborating documentation showing that many sales occurred in the United States prior to the critical date, including sales to one hospital in California in 1991.

In response, Volovik focuses on the testimony from two Beckman engineers in which they acknowledge that there were over 24 design changes to various parts of the CX3® pump within the last ten years. Because there were numerous design changes, Volovik asserts that there is a genuine issue of material fact concerning whether a CX3® pump with all of the alleged elements was on sale prior to the critical date. Volovik also challenges the sufficiency of Bayer's evidence regarding sales because he argues that the documentation produced by Beckman does not show that the CX3® analyzers sold prior to the critical date had a CX3® pump with all of the elements of claim 1.

The record reveals sales before the critical date. The documentation related to the sales to the Californian hospital shows that a CX3® pump, identified by part number, was sold in 1991. Moreover, the record reveals that the version of the CX3® pump sold prior to the critical date is the same version Bayer now alleges anticipates claim 1 of the '562 patent. From the 1991 California sales documents, the part number of the pump can be traced to assembly drawings that depict a pump with all of the elements Bayer alleges anticipate claim 1. Viewing the evidence in the light most favorable to Volovik, the record reveals that Bayer has met its clear and convincing burden of showing that a CX3® pump with all of the elements *alleged* by Bayer to anticipate claim 1 was on sale prior to the critical date.

Given this conclusion, the remaining issue with respect to the CX3® pump is whether it anticipates claim 1 of the '562 patent. The dispute on this issue centers around the fourth element of claim 1, which includes a "means for accurately positioning the piston element."

Previously, the Court concluded that this element was a means-plus-function element and construed the means element as "comprising a stepper motor and a lead screw that is connected to the piston, and equivalents thereof." Bayer asserts that the CX3® pump contains this element or its equivalent, and Volovik contends that it does not. The focus, then, is on whether the CX3® pump performs the substantially the same function in substantially the same way to achieve substantially the same results as does the fourth element in claim 1. *See Odetics*, 185 F.3d at 1267.

The CX3® pump uses a "turn-screw" configuration in which the lead screw is connected to the piston by a nut that moves with the piston. Claim 1 uses a "turn-nut" configuration in which the nut turns the lead screw while the lead screw moves up and down with the piston. Bayer and Hendrick assert that there is no justification for limiting claim 1 to a turn-nut configuration because the figures in patent '562 do not depict any nut at all. Hendrick opines that the turn-screw configuration satisfies the "means for positioning" element of claim 1 because the means element allows for the lead screw to be directly or indirectly connected to the piston by way of a nut. In the case of the CX3® pump, the lead screw is indirectly connected to the piston by the nut, which then causes the piston to be positioned properly within the chamber. This method, accordingly to Hendrick, satisfies the fourth element of claim 1. In response, Durfee opines that CX3® pump's use of the turn-screw configuration is not equivalent to the turn-nut configuration because the turn-screw configuration does not position the piston in the chamber in the same way as the turn-nut configuration does, and it does not achieve the same results of a more compact pump and less seal wear. Volovik also asserts that the CX3® pump does not anticipate claim 1 because it is multi-chambered and claim 1 is limited to one chamber.

Viewing the evidence in the light most favorable to Volovik and considering the reports

from the parties' expert witnesses, a reasonable fact-finder conclude that the turn-screw configuration in the CX3® pump does not position the piston in chamber in substantially the same way to achieve substantially the same results as does the means claimed in the fourth element of claim 1 and that claim 1 is limited to one chamber. As such, there is a genuine issue of material fact, and the Court denies Bayer's summary judgment motion with respect to whether the CX3® pump anticipates claim 1 of the '562 patent.

*b. Patent Invalidity Based on Failure to Disclose the Best Mode*

Bayer moves for summary judgment, contending that the '562 patent is invalid because Giter failed to disclose the best mode of sealing the piston in claim 1. A patent is invalid if the specification fails to set forth at the time of filing the "best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. §112(1) (2000). "The purpose of the best mode requirement is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of the inventions they have in fact conceived." *Teleflex, Inc. v. Ficosa N.A. Corp.*, 299 F.3d 1313, 1330 (Fed. Cir. 2002). Compliance with the best mode requirement is a question of fact which involves a two-pronged inquiry: the first prong focuses on the inventor's state of mind at the time he or she filed the patent application, and the second prong focuses on whether the inventor adequately disclosed the mode he or she considered to be superior. *Id.*

The best mode requirement does not apply to production details, such as customer demands and availability of materials, or to routine details, such as alternative means for accomplishing a particular detail. *Id.* at 1331. In addition, the best mode requirement does not apply to "unclaimed subject matter unrelated to the properties of the invention." *Bayer AG v. Schein Pharm., Inc.,* 301 F.3d 1306, 1322 (Fed. Cir. 2002).

Bayer asserts that the '562 patent is invalid because Giter knew that a spring energized seal, which is a seal in which a spring is enclosed within the body of the seal, would work best in his invention and that nowhere in the patent does he disclose or suggest such a seal. In response, Volovik argues that Giter did not violate the best mode requirement because the type of seal needed is not part of the claimed invention. For this reason, Volovik asserts that there is no need to reach the two-pronged inquiry.

The second element of claim 1 of the '562 patent recites a "means in the inner surface of the side wall for carrying a seal therein." It does not discuss any particular type of seal, and the specifications do not teach any particular type of seal. While it is true that Giter testified that he thought a spring-energized seal would perform best, he also testified that the type of seal needed was not critical to his invention. Instead, Giter explained that the way the seal (any type of seal) was mounted was the critical element of claim 1. As such, the type of seal is unclaimed subject matter. As the Federal Circuit has explained, information related to unclaimed subject matter does not invoke the best mode requirement. *See Teleflex,* 299 F.3d at 1332-33 (concluding that the best mode requirement was not violated because the thickness and type of clip needed was unclaimed subject matter that was not described in the patent claims). Accordingly, the Court denies Bayer's summary judgment motion with respect to patent invalidity based on a failure to disclose the best mode.

*3. Non-Infringement*

Bayer moves, in the alternative, for summary judgment of non-infringement. Bayer argues that if the three prior references are found not to anticipate claim 1 of the '562 patent, then its allegedly infringing pump cannot infringe claim 1 because Bayer's pump carries its seal in a manner similar to that used in the AxSym® and Spectrum® pumps and because Bayer's

pump includes a means for positioning the piston that is similar to the one used in the CX3® pump. The proper inquiry for non-infringement, however, is to compare the accused device to the properly construed claim, not the accused device to prior art references. *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993). Accordingly, Bayer's alternative motion is denied.

4. *Entire Market Value*

Bayer moves for summary judgment, seeking to prohibit Volovik from asserting his damages theory under the entire market value rule. A patentee is entitled to no less "than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284 (2000). "When a patentee seeks damages on unpatented components sold with a patented apparatus, courts have applied a formulation known as the entire market value rule to determine whether such components should be included in the damage computation." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (internal quotations omitted). The entire market value rule allows for recovery of damages based on the value of an entire apparatus containing several features, even when only one feature is patented. *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1552 (Fed. Cir. 1997). Such recovery is permitted, however, only "when the patented feature is the basis for customer demand for the entire machine." *Id.*

Bayer seeks an order that precludes Volovik from seeking damages on Bayer's sales of the Centaur System or of the consumables or reagents sold for use in the Centaur System. Bayer asserts that the entire market value rule is not applicable, among other reasons, because Volovik has not shown that that accused pump is the basis for customer demand. In response, Volovik explains that "pump quality produces accurate test results, which in turn drives purchasers to buy a particular immunoassay machine." The allegedly infringing pumps, according to Volovik, are

superior to the pumps previously used in the Centaur System, and for that reason, the alleged infringing pumps are the basis of the customer demand.

The Centaur System is a complicated system that includes numerous components of equipment, including nine pumps that allegedly infringe the '562 patent. When it was first sold, the Centaur System used pumps different from the allegedly infringing pumps. In systems sold more recently, the allegedly infringing pumps replaced the prior pumps. After reviewing key documents in this case, Kenneth Blick, Volovik's expert, concluded that speed and reliability are the key factors that drive customer demand in the immunoassay market. He opines that the entire market value rule is appropriate because the "highly accurate and reproducible pipetting/dilutor system . . . plays a critical role" in helping the Centaur System deliver fast and reliable results. In reaching this conclusion, Blick relies on the 2000 United States Hospitals Clinical Chemistry, Immunoassay, and Hematology Instrument Survey. That survey does not differentiate between the Centaur Systems with the allegedly infringing pumps and those sold earlier without the allegedly infringing pumps. Indeed, a large percentage of the survey responses came from Centaur System purchasers who had purchased systems without the allegedly infringing pumps. It is true that the survey does establish that speed and reliability are the basis for customer demand. However, the survey does not support a conclusion that the accused pumps in the Centaur System were the basis for customers' decisions to purchase the machine because there is no way to tell whether those responding to survey had a system with or without the allegedly infringing pumps. In fact, Blick conceded this point:

> Q: And to the extent the Centaur gets high market performance, you can't tell from the survey whether the Centaur machine that was the basis for that had the [accused] pumps or other pumps?
>
> A: No, I can't. I can't. I really can't.

Moreover, Blick acknowledged that there was no evidence that the purchasers of the system with the non-infringing pump were unsatisfied with the systems or that the increased customer demand for the Centaur System was attributable to the allegedly infringing pumps' presence in the later-designed systems. Given these concessions, Blick's opinion does not support a finding that accused pumps are the basis for customer demand.

In addition, Volovik's reliance on Glen Carey, the chief design engineer of the Centaur System, is also misplaced. Carey testified that the performance of the pump is "one of the things" that is critical to the functioning of the system. He did not say, however, that a particular pump was critical or that only a pump was critical to the performance. Without more, Carey's statements do not support Volovik's assertion that customer demand was driven by the allegedly infringing pumps.

Viewing the evidence in the light most favorable to Volovik, the Court concludes that there are no genuine issues of material fact with respect to whether Volovik has shown that the allegedly infringing pumps are the basis of the customer demand for the Centaur System. Accordingly, the Court grants Bayer's motion for denying damages based on the entire market value rule.

**B. Motions in Limine**

*1. To Preclude Volovik From Submitting Evidence for or Recovery On Alleged Future Injury*

Bayer seeks to preclude Volovik from presenting evidence on, or otherwise seeking recovery from, future royalty damages for alleged patent infringement. The dispute centers around Volovik's use of data related to future sales of the Centaur System. Bayer's investment bankers prepared the data in conjunction with Bayer's 1998 acquisition of Chiron Diagnostics.

Specifically, Bayer makes this motion to "preclude Volovik from using this evidence to

recover a present-day award of royalty damages based on *projected future revenues* (for sales that are not actual, have not yet been made, and may never be made.)" Citing *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), Bayer asserts that it does not seek to exclude any evidence of Bayer's future projections for "legitimate uses," such as for use in determining the royalty rate that would have been negotiated at the time the infringement began. In response, Volovik asserts that Bayer is mischaracterizing his damages theory. He explains that he is only "seeking a reasonably royalty from Bayer based on its past infringement" and that he "is not using [the data] in order to seek a present monetary award on sales that have not yet occurred."

Based on the parties' statements made in conjunction with this motion, the Court concludes that there is no dispute on this issue. Bayer concedes that the data can be used in the context of a hypothetical negotiation, and Volovik concedes that he is not seeking a reasonable royalty on sales that have not yet occurred. For these reasons and in the limited context of the dispute as currently before the Court, the Court grants Bayer's motion in limine.

2. *To Preclude Volovik From Submitting Evidence as to Damages Prior to December 22, 1999*

Bayer seeks to preclude Volovik from introducing evidence of damages prior to December 22, 1999. According to Bayer, that is the earliest date on which Volovik could have obtained legal title to the '562 patent. For the reasons set forth in section A.1. of this Order, it has not yet been determined when and whether Volovik received legal title to the patent. Accordingly, this motion is premature. Therefore, the Court denies Bayer's motion in limine.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Volovik's Motion for Summary Judgment on Patent Ownership and on Bayer's Affirmative Defense of Lack of Standing [Docket No. 165] is DENIED.

2. Bayer's Motion for Summary Judgment of Patent Invalidity or, in the alternative, of Non-Infringement [Docket No. 172] is DENIED.

3. Bayer's Motion for Summary Judgment Denying Damages Based on the Entire Market Value Rule [Docket No. 156] is GRANTED.

4. Bayer's Motion in Limine to Preclude Volovik from Submitting Evidence Relating to Royal Damages for Alleged Future Injury [Docket No. 150] is GRANTED.

5. Bayer's Motion in Limine to Preclude Volovik from Submitting Evidence as to Damages for Any Infringement Prior to December 22, 1999 [Docket No. 153] is DENIED.

Dated: January 7, 2004.

JOAN N. ERICKSEN
United States District Judge