# Exhibit A

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/006,942 | 02/18/2004 | 5540562 | BAYE-L2 | 8902 |

32300 7590 04/08/2004

BRIGGS AND MORGAN, P.A.
2400 IDS CENTER
MINNEAPOLIS, MN 55402

| EXAMINER | |
|---|---|
| FREAY | |
| ART UNIT | PAPER NUMBER |
| 3746 | 5 |

DATE MAILED: 04/08/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. 90/006,942 | Patent Under Reexamination 5540582 | |
|---|---|---|---|
| | Examiner Charles G Freay | Art Unit 3746 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed *18 February 2004* has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892, b)☒ PTO-1449, c)☐ Other: ____

1. ☒ The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐ The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)). Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐ by Treasury check or,

b) ☐ by credit to Deposit Account No. ____, or

c) ☐ by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Charles G Freay
Primary Examiner
Art Unit: 3746

cc:Requester ( if third party requester )

## DECISION

A substantial new question of patentability affecting claim 1 of United States Patent Number 5,540,562 (Giter) is raised by the request for reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extension of time in reexamination proceedings are provided for in 37 CFR 1.550(c).

The request indicates that Requester considers that claim 1 is unpatentable in view of WO-A 07 712 (Furness).

The request further indicates that Requester considers that claim 1 is unpatentable in view of US Pat. No. 5,253,981 (Yang).

The request further indicates that Requester considers that claim 1 is unpatentable in view of Japanese patent application 2-213729 (Kudo).

The request further indicates that Requester considers that claim 1 is unpatentable in view of US Pat. No. 5,637,208 (Dourdeville).

The request further indicates that Requester considers that claim 1 is unpatentable in view of US Pat. No. 5,536,471 (Clark '471).

The request further indicates that Requester considers that claim 1 is unpatentable in view of US Pat. No. 5,358,691 (Clark '691).

Additionally, the request further indicates that Requestor considers that claim 1 could be found obvious in view of various combinations of the above noted references and additionally cited references.

It is agreed that the consideration of each of Furness, Yang, Kudo, Dourdeville, Clark '471 and Clark '691 considered either alone or combination with other teachings from the prior art raise a substantial new question of patentability as to claim 1 of the Giter patent. As pointed out in the request Furness (at pages 13-16 of the request), Yang (at pages 16-19 of the request), Kudo (at pages 19-21 of the request), Dourdeville (at pages 21-24 of the request), and Clark '471 & '691 (at pages 24-29) disclose accurate positioning means in the form of a stepper motor and a screw type drive, wherein the positioning means is substantially axially aligned with the piston and the chamber. The teaching of an accurate positioning means in the form of a stepper motor and a screw type drive which is axially aligned with a piston which reciprocates within an elongated chamber was not present in one reference during the prosecution of the application which became the Giter patent. Further, there is a substantial likelihood that

a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly Furness, Yang, Kudo, Dourdeville and Clark '471 & '691 raise a substantial new question of patentability as to claim 1, which question has not been decided in a previous examination of the Giter patent.

Claims 2-19 include the further limitation that the piston comprises a stepped rod. European Patent Application 0 039 146 discloses a piston having a stepped rod which reciprocates in an elongated chamber. Therefore, claims 2-19 will be reexamined along with claim 1 of the Giter patent.

## *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Charles G Freay whose telephone number is 703-308-0639. The examiner can normally be reached on Monday through Friday 10:00 A.M. to 5:30 P.M..

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Justine Yu can be reached on 703-308-2675. The fax phone number for the organization where this application or proceeding is assigned is 703-872-9306.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

Charles G Freay
Primary Examiner
Art Unit 3746

CGF
March 26, 2004

Sheet 1 of 1

| | | |
|---|---|---|
| **Form PTO-1449 Modified**<br><br>List of Patent and Publications Cited by Applicant (Use several sheets if necessary)<br><br>U.S. Department of Commerce Patent and Trademark Office | Docket No. BAYE-L2 | Application No. 234,282 |
| | Requester Bayer Healthcare, L.L.C. | |
| | Filing Date February 18, 2004 | Group |
| | Confirmation No. | |

**U. S. PATENT DOCUMENTS**

| Examiner Initial | | Document No. | Date | Name | Class | Subclass |
|---|---|---|---|---|---|---|
| CGF | 1 | 5,253,981 | 10/19/93 | Yang et al. | 417 | 3 |
| | 2 | 5,536,471 | 7/16/96 | Clark et al. | 427 | 63 |
| | 3 | 5,358,691 | 10/25/94 | Clark et al. | 422 | 64 |
| | 4 | 4,089,624 | 5/16/78 | Nichols et al. | 417 | 362 |
| | 5 | 5,637,208 | 6/10/97 | Dourdeville | 210 | 90 |
| | 6 | 5,219,099 | 6/15/93 | Spence et al. | 222 | 325 |
| | 7 | 5,312,233 | 5/17/94 | Tanny et al. | 417 | 316 |
| | 8 | 4,888,998 | 12/26/89 | Buzza et al. | 73 | 864.21 |
| | 9 | 5,516,429 | 5/14/96 | Snodgrass et al. | 210 | 767 |
| CGF | 10 | 4,775,481 | 10/4/88 | Allington | 210 | 656 |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initial | | Document No. | Date | Country | Translation YES | Translation NO |
|---|---|---|---|---|---|---|
| CGF | 11 | WO 88/07712 | 10/6/88 | PCT | | |
| CGF | 12 | JP 2-213729 | 8/24/90 | Japan | XX | |
| CGF | 13 | Europe 0 039 146 | 4/11/81 | Europe | | |
| | 14 | | | | | |
| | 15 | | | | | |

**EXAMINER** Freay **DATE CONSIDERED** 4/6/04

© 2004 WW

FEB 1 8 2004
PATENT & TRADEMARK OFFICE

Sheet 1 of 1

| Form PTO-1449 Modified<br>37 CFR 1.501<br>INFORMATION DISCLOSURE CITATION IN A PATENT<br>(Use several sheets if necessary)<br>U.S. Department of Commerce<br>Patent and Trademark Office | Docket No. | Patent No.<br>5,540,562 |
|---|---|---|
| | Applicant<br>Bayer Healthcare, L.L.C. | |
| | Filing Date<br>February 13, 2004 | Group |

**OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)**

| | | |
|---|---|---|
| CaP | 1 | Alexander H. Slocum, Precision Machine Design, (1992), pp. 705-733. |
| | 2 | |
| | 3 | |
| | 4 | |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |

| | |
|---|---|
| EXAMINER Freay | DATE CONSIDERED 4/6/04 |

© 2004 WW

# Exhibit B

# REQUEST FOR REEXAMINATION IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**Applicant: Bayer Healthcare, L.L.C.** **Filed: February 18, 2004**

**Patent No.: 5,540,562** **Application No.: 234,282**

**Issued: July 30, 1996**

**For: Single-Piston, Multi-Mode Fluid Displacement Pump**

**MAIL STOP EX PARTE REEXAM**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## REQUEST FOR *EX PARTE* REEXAMINATION PURSUANT TO 37 CFR § 1.510

☒ This is a Request for Reexamination of patent number 5,540,562 issued on July 30, 1996.

☒ The name and address of the person requesting reexamination is John M. Paolino, Bayer Healthcare, L.L.C., 511 Benedict Avenue, Tarrytown, NY 10591-5097.

☒ Reexamination of claim 1 is requested.

☒ An English language translation of all necessary and pertinent non-English language patents or printed publications is included.

☒ The attached detailed request includes at least the following items:

- ☒ A statement identifying each substantial new question of patentability based on prior patents and printed publications. 37 CFR § 1.510(b)(1).
- ☒ An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited prior art to every claim for which reexamination is requested. 37 CFR § 1.510(b)(2).
- ☒ A copy of every patent or printed publication relied upon is submitted herewith including a listing thereof on form PTO-1449. 37 CFR § 1.510(b)(3).

☒ A copy of the patent to be reexamined or a permanent reproduction thereof in double column format of the printed patent securely mounted on one side of a separate paper is enclosed. 37 CFR § 1.510(b)(4).

☐ A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is included. 37 CFR § 1.510(b)(4).

☒ It is certified that a copy of this request (if filed by other than the patent owner) has been served in its entirety on the alleged patent owner as provided in 37 CFR § 1.33(c). The name and address of the parties served and the date of service are.

1. Dmitry Volovik, the alleged patent owner of record, on February 13, 2004 at

1764 Montreal Avenue
St. Paul, MN. 55116

2. Mr. Volovik's attorney, Mr. Thomas Hamlin of Robins, Kaplan, Miller & Ciresi, L.L.P., on February 13, 2004 at:

Robins, Kaplan, Miller & Ciresi LLP
2800 LaSalle Plaza
800 LaSalle Ave.
Minneapolis, MN. 55402-2015
612-349-8500

3. Mr. Gerald Helget, the attorney, for the last owner of record, on February 13, 2004:

Briggs and Morgan PA
80 S Eighth St
2200 IDS Center
Minneapolis MN US 55402
612-334-8480

An extra copy of the request is also enclosed.

☐ A proposed amendment is included (only where the patent owner is the requester). 37 CFR § 1.510(e).

☐ A check in the amount of **$______** is attached. Please charge any deficiency or credit any overpayment to Deposit Account 23-3050.

☒ Please charge Deposit Account No. 13-3370 in the amount of **$2,520.00**. This sheet is attached in duplicate.

☒ The Commissioner is hereby requested to grant an extension of time for the appropriate length of time, should one be necessary, in connection with this filing or any future filing submitted to the U.S. Patent and Trademark Office in the above-identified application during the pendency of this application. The Commissioner is further authorized to charge any fees related to any such extension of time to Deposit Account 23-3050. This sheet is provided in duplicate.

Date: February 18, 2004

**John M. Paolino, Reg. No. 40,340**
Attorney for Bayer Healthcare, L.L.C.
511 Benedict Avenue
Tarrytown, NY 10591-5097
Telephone: (914) 524-2552
Facsimile: (914) 524-3594

☐ Patent Owner
☐ Third Party Requester
☐ Attorney or Agent for Patent Owner
☒ Attorney or Agent for Requester

**REQUEST FOR *EX PARTE* REEXAMINATION**
**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

**Requester:** Bayer Healthcare, L.L.C. **Filed:** February 18, 2004

**Patent No.:** 5,540,562 **Serial No.:** 234,282

**Issued:** July 30, 1996

**For:** Single-Piston, Multi-Mode Fluid Displacement Pump

**Statements (I) Identifying Each Substantial New Question Of Patentability Based On Prior Patents And Printed Publications, (II) Identifying Every Claim For Which Reexamination Is Requested, (III) Providing Detailed Explanation Of The Pertinence And Manner Of Applying The Cited Prior Art To Every Claim For Which Reexamination Is Requested; And (IV) Certificate of Service Of Request**

Bayer Healthcare (Bayer) requests reexamination of claim 1 of U.S. Patent Number 5,540,562, (Ex. A) which issued on July 30, 1996 to Ashirus Technologies, Inc. (hereinafter "the 562 patent"). Dmitry Volovik alleges that he now owns the 562 patent.

This request is made in light of highly material prior art that was *not considered* during the prosecution of the 562 patent. This art not only raises substantial, new questions of patentability, but firmly establishes that claim 1 of the 562 should never have issued. In particular, Bayer cites the following prior art references: WO-A-88 07 712 (Furness); U.S. U.S. Patent No. 5,253,981 (Yang); U.S. Patent No. 5,536,471 (Clark 471); Patent No. 5,358,691 (Clark 691); U.S. Patent No. 4,089,624 (Nichols); Japanese patent application 2-213729 (Kudo); U.S. Patent No. 5,637,208 (Dourdeville); published EPO patent application 0 039 146 (Buzza EPO); U.S. Patent No. 5,219,099 (Spence); U.S. Patent No. 5,312,233 (Tanny); U.S. Patent No. 4,888,998 (Buzza 998); and U.S. Patent No. 5,516,429 (Snodgrass) Copies of these references are attached as Exhibits B-M.

By way of background, Bayer Healthcare discovered some of the prior art after it was sued by Mr. Dmitry Volovik for alleged infringement of claim 1 of the 562 patent. The

litigation is pending in the Federal District of Minnesota. There has been *no decision on the merits* regarding any prior art issues and *no final decision*. Therefore, under MPEP §2286 no decision by the District Court on any issue is binding on the PTO. In fact, MPEP §2286 provides that the determination of whether a substantial new question of patentability exists "*will be made*" independently of a district court's decision on validity.

In response to allegations made by Mr. Volovik, Bayer Healthcare submitted two motions which each requested summary judgment (a judgment that a Court can make without a jury when there are no genuine disputes regarding material facts) that claim 1 of the 562 patent is invalid over certain prior art. Although both motions were denied, they were denied *not* because the 562 patent was determined to be valid over the prior art. Rather, they were denied because under rules governing court procedure the Court decided that the jury, not the Judge, had to decide issues concerning the prior art's teachings. The Court did so using the "clear and convincing" burden of proof which does *not* apply in these proceedings. The Court did not resolve the anticipation questions. Questions of obviousness were *not* raised with the Court in these motions because of certain procedural rules. Presently, a trial date has not been scheduled. Thus, Bayer Healthcare submits this request so that the PTO can determine the undecided anticipation and obviousness issues.

Even though there has been litigation, it is important to note that the PTO must make its own assessment of the patentability of claim 1 of the 562 patent. MPEP §2286. One reason for this is because a court and the patent office use much different standards in assessing patentability (*id.*). A court presumes a patent to be valid and considers prior art patentability issues under a "clear and convincing" evidence standard (*id.*). In contrast, the PTO is not constrained by any such presumption or the clear and convincing standard.

As described below, Bayer submits overwhelming evidence that claim 1 should never have issued. None of this art was considered during the 562 patent's examination.

## I. Statement Identifying Each Purported Substantial New Question Of Patentability Based On Prior Patents And Printed Publications

Pursuant to 37 C.F.R. § 1.510(b)(1), Bayer submits the following patents or printed publications (copies of which are attached as Exs. B-M) which each raise a substantial new question of patentability either alone or in combination with other references. None of the references listed below were considered during the examination of the 562 patent, and each of the references either anticipates or renders obvious claim 1 of the 562 patent.

1. Whether claim 1 of the 562 patent is anticipated by WO-A-88 07 712 (Furness) (Ex. B).

2. Whether claim 1 of the 562 patent is obvious over Furness (Ex. B) in view of any of U.S. Patent No. 5,253,981 (Yang) (Ex. C), U.S. Patent No. 5,536,471 (Clark 471) (Ex. D), U.S. Patent No. 5,358,691 (Clark 691) (Ex. E), U.S. Patent No. 5,312,233 (Tanny) (Ex. K), or U.S. Patent No. 4,089,624 Nichols (Ex. F).

3. Whether claim 1 of the 562 patent is anticipated by U.S. Patent No. 5,253,981 (Yang) (Ex. C).

4. Whether claim 1 is obvious over Yang (Ex. C) in view of Nichols (Ex. F).

5. Whether claim 1 of the 562 patent is anticipated by Japanese patent application 2-213729 (Kudo) (Ex. G) with English translation.

6. Whether claim 1 is obvious over Kudo in view of any of Yang, (Ex. C), U.S. Patent No. 5,637,208 (Dourdeville) (Ex. H), or Nichols (Ex. F).

7. Whether claim 1 of the 562 patent is anticipated by U.S. Patent No. 5,637,208 (Dourdeville) (Ex. H).

8. Whether claim 1 of the 562 patent is anticipated by U.S. Patent No. 5,536,471 (Clark 471) (Ex. D).

9. Whether claim 1 of the 562 patent is anticipated by U.S. Patent No. 5,358,691 (Clark 691) (Ex. E).

10. Whether claim 1 of the 562 patent is obvious over Clark 471 (Ex. D) in view of any of Douderville (Ex. H), Nichols (Ex. F), Buzza EPO (Ex. I), Yang (Ex. C) or Spence (Ex. J).

11. Whether claim 1 of the 562 patent is obvious over Clark 691 (Ex. E) in view of any of Douderville (Ex. H), Nichols (Ex. F), Buzza EPO (Ex. I), Yang (Ex. C) or Spence (Ex. J).

12. Whether claim 1 of the 562 patent is obvious over European Application No. 0 039 146 (Buzza EPO) (Ex. I) in combination with either U.S. Patent No. 4,888,998 (Buzza 998) (Ex. L) or U.S. Patent No. 5,219,099 (Spence) (Ex. J).

13. Whether claim 1 of the 562 patent is obvious over U.S. Patent No. 4,089,624 (Nichols) (Ex. F) alone or in combination with one or more of Yang (Ex. C), Clark 471 (Ex. D), Clark 691 (Ex. E), or Tanny (Ex. K).

14. Whether claim 1 of the 562 patent is obvious over U.S. Patent Nos. 5,516,429 (Snodgrass) (Ex. M) alone or in combination with one or more of Yang (Ex. C), Tanny (Ex. K), Clark 471 (Ex. D), Clark 691 (Ex. E), or Nichols (Ex. F).

15. Whether claim 1 of the 562 patent is obvious over U.S. Patent No. 5,312,233 (Tanny) (Ex. K) alone or in combination with one or more of Yang (Ex. C), Dourdeville (Ex. H), or Nichols (Ex. F).

## II. Identification Of Claim For Which Reexamination Is Requested

Bayer requests reexamination of claim 1 of the 562 patent. Claim 1 is set forth below:

1. A fluid displacement pump, comprising;

(a) a housing, having a top wall, bottom wall, and side wall, the bottom wall and side wall each having an inner surface, the top wall, bottom wall, and side wall enclosing an interior therebetween,

(b) means in the inner surface of the side wall for carrying a seal therein,

(c) an elongated chamber, formed by the inner surface of the bottom wall, inner surface of the side wall, and the seal, having a piston reciprocally mounted therein, the piston sliding through the seal,

(d) means for accurately positioning the piston within the chamber so as to measure a fluid displacement, wherein the positioning means further comprises a stepper motor and a lead screw, and

(e) two ports for aspirating and dispensing fluid from the chamber wherein the positioning means is substantially axially aligned with the piston and the chamber.

## III. Detailed Explanation Of The Pertinence And Manner In Which The Cited Prior Art Should Be Applied To Claim 1 And The Reasons Why Such Prior Art Raises A Substantial New Question Of Patentability

Pursuant to 37 C.F.R. § 1.510(b)(2), Requester hereby sets out a background of the invention defined by claim 1 of the 562 patent, followed by a detailed explanation of the pertinence and manner in which the cited prior art should be applied to the subject claims, and the reasons why such prior art raises a substantial new question of patentability.

### A. Claim 1 Of The 562 Patent

As outlined above, claim 1 has five main elements, (a) a housing, (b) means in the inner surface of the side wall for carrying a seal, (c) an elongated chamber, (d) means for accurately positioning that comprises a stepper motor and a lead screw that are axially aligned with the piston and the chamber, and (e) two ports for aspirating and dispensing fluid. Figure 2 of the 562 patent has been colored and labeled below to show the claim elements as exemplified in the patent specification.




FIGURE 2 OF 562 PATENT

The 562 patent specification describes a housing which has been colored yellow in Figure 2. The patent specification also describes the "means for carrying a seal" as an annular groove into which the seal (blue) is mounted (Ex. A at Fig. 2 & 2:38-40[1]). A chamber is defined by the housing's bottom wall and side walls and the seal. A piston (pink) extends into the chamber through the seal. A stepper motor (orange) and lead screw (purple) move the piston through the seal and thereby move fluid into and out of the chamber. The stepper motor, lead screw, and piston are axially aligned, as shown in Fig. 2 of the 562 Patent. The pump has two ports (green) for aspirating and dispensing fluid.

Notably, claim 1 of the 562 patent is the *only* claim of the 562 patent that does *not* recite a piston that comprises a stepped rod 38 (*i.e.*, a piston having a larger diameter section

---

[1] "X:Y-Z" refers to the patent column:line-line.

and a smaller diameter section) as shown in Figures 3-9 of the 562 patent. Rather, claim 1 of the 562 patent recites merely a piston 28, such as that shown in Figure 2.

A summary of the prosecution history of the 562 patent is provided below so that the relevancy of the prior art cited herein will become readily apparent. Claim 1 as originally filed was identical to issued claim 1 with one exception. Application claim 1 lacked the clause "wherein the positioning means further comprises a stepper motor and a lead screw." This "wherein" clause was set forth in dependent application claim 2 as originally filed.

In the first office action, claim 1 was rejected as anticipated by U.S. Patent No. 4,715,791 (Berlin) (Ex. S) and as obvious over U.S. Patent No. 3,155,041 (Green) (Ex. T) in view of U.S. Patent No. 1,695,305 (Upton) (Ex. U) (June 2, 1995 Office Action at 2-4). Claim 2 was rejected as obvious over Berlin in view of U.S. Patent No. 4,566,868 (Menzies) (Ex. V) and as obvious over Menzies in view of Green and Upton (*id.*).

According to the office action Berlin anticipates application claim 1 because it discloses the housing, seal, chamber, piston, carrying means, and positioning means (*id.* at 2). The office action further states that Green shows "a device similar to applicant's," Upton discloses an "annular groove" and seals, and it would have been obvious to combine them to form application claim 1 (*id.* at 3). Neither Berlin, Green, nor Upton discloses a stepper motor and lead screw axially aligned with the piston and chamber as recited in application claim 2. Menzies, however, discloses an axial aligned stepper motor/lead screw drive. Thus, claim 2 was rejected over Menzies combined with either Berlin or Green and Upton (*id.* at 3-4).

In response to the anticipation rejection over Berlin, the patent applicant amended claim 1 to include the stepper motor and lead screw "wherein" clause which was originally contained in application claim 2 (August 22, 1995 Response at 2). The applicants argued

that Berlin did not anticipate amended claim 1 because it "does not disclose a stepper motor and lead screw" (*id.* at 11). Applicants further argued that amended claim 1 was nonobvious over Berlin and Menzies because (i) Menzies "deals with the problem of a liquid pressure source for use in soil mechanics laboratories" and is therefore non-analogous art; and (ii) Menzies does not disclose the claimed lead screw (*id.* at 11, 13).

Applicants also argued that amended claim 1 was nonobvious over Green, Upton, and Menzies because (i) "neither Green nor Upton discloses a stepper motor and a lead screw; (ii) Green does not disclose seals as claimed; (iii) there is no suggestion to combine Green and Upton; (iv) there are no need for seals in Green because Green is not used to dispense two different fluids which must be kept from mixing; and (v) Green and Upton are non-analogous art (*id.* at 12-16).

Unpersuaded, the patent office maintained the obviousness rejections of amended claim 1 (October 11, 1995 Office Action at 2). Following this rejection, the applicants filed an appeal brief. Applicants again argued that amended claim 1 was nonobvious because (i) neither Berlin nor Menzies disclose the claimed lead screw; (ii) Menzies is nonanalogous art; (ii) Green does not disclose seals; (iii) combining Green with Upton would render Green inoperative; and (iv) and there is no motivation to combine Green and Upton (Appeal Brief at 6-14). In response, the patent office issued a notice of allowability. No specific reasons for allowance were provided.

Since the issuance of the 562 patent, Bayer has uncovered numerous highly material prior art references which were *not* considered by the patent office in examining the 562 patent. This new prior art cures the deficiencies in the art relied on during prosecution. The art relied on during prosecution was considered not to anticipate and not combinable to form the claimed invention. Unlike that art, these new references disclose fluid displacement

pumps having all of the claim elements (*i.e.*, stepper motors, lead screws, axial alignment, annular grooves for carrying seals, pistons, chambers, and housings). At least six of the prior art references discussed below anticipate claim 1. Further, at least eleven of the prior art references teach an axially aligned stepper motor/lead screw pump drive, and the motivation to use such drives. Thus, there are not only substantial new questions of patentability, but also overwhelming evidence that claim 1 would not have issued if the prior art references described below had been considered.

### B. The Cited Patents and Printed Publications Anticipate **Or Render Obvious Claim 1 of the 562 Patent**

Provided below is a detailed explanation of how the teachings of the prior art correspond to claim 1. For ease of understanding, figures from the prior art have been reproduced and colored with the same colors that were used to highlight the claimed features in Figure 2 of the 562 patent. Further, claim 1's elements are referred to as elements (a)-(e) as set forth below with the last "wherein" clause included in the "positioning means" element as shown below in italics:

(a) a housing, having a top wall, bottom wall, and side wall, the bottom wall and side wall each having an inner surface, the top wall, bottom wall, and side wall enclosing an interior therebetween,

(b) means in the inner surface of the side wall for carrying a seal therein,

(c) an elongated chamber, formed by the inner surface of the bottom wall, inner surface of the side wall, and the seal, having a piston reciprocally mounted therein, the piston sliding through the seal,

(d) means for accurately positioning the piston within the chamber so as to measure a fluid displacement, wherein the positioning means further comprises a stepper motor and a lead screw, *wherein the positioning means is substantially axially aligned with the piston and the chamber*, and

(e) two ports for aspirating and dispensing fluid from the chamber.

This simple comparison of the colored figures and the teachings of the prior art to claim 1 of the 562 patent shows that it should never have issued.

### 1. Claim 1 is anticipated by WO-A-88 07 712 (Furness) or obvious over Furness in view of any of Yang, Clark 471, Clark 691, or Tanny

Furness[2] discloses all of the elements of claim 1 of the 562 patent and therefore anticipates claim 1. During the prosecution of the European counterpart to the 562 patent, EP 0 757 757 B1 (Ex. W), the patent applicant explicitly admitted that Furness anticipates claim 1. In particular, the applicant described Furness (WO-A-88 07712) in the 562 counterpart EPO application as follows:

> WO-A-88 07 712 discloses a fluid displacement pump, comprising a *housing*, having a top wall, a bottom wall, and side wall, the bottom wall and side wall each having an inner surface, the top wall, bottom wall, and side wall enclosing an interior therebetween, *means in the inner surface of the side wall for carrying a seal therein, an elongated chamber*, formed by the inner surface of the bottom wall, inner surface of the side wide and the seal, having a piston reciprocally mounted therein, the piston sliding through the seal, *means for accurately positioning the piston* within the chamber so as to measure a fluid displacement, wherein the positioning means further comprises *a stepper motor and a lead screw*, and *two ports* for aspirating and dispensing fluid from the chamber, wherein the positioning means is *substantially axially aligned* with the piston and the chamber.

(EPO 757, Ex. W, at col. 1, ¶0004) (emphasis added). There is simply *no difference* between claim 1 of the 562 patent and the 562's patentee's description of Furness in the European counterpart patent application.

Lest there by any doubt, a portion of Figure 2 of Furness has been colored and annotated below to show the claim elements.

[2] Furness is prior art under 35 U.S.C. § 102(b).




As shown in yellow, Furness teaches the claimed "housing" element (a). Furness also teaches the claimed "means for carrying the seal" element. The 562 patent discloses an annular groove as the claimed seal carrying means. Identically, Furness discloses "an annular groove 32 in the cylinder wall" for carrying "seal 14" (Furness, Ex. B, at p. 5: 3-4).

Furness also discloses the "chamber" element (c) of claim 1. Specifically, Furness descries the pump as comprising "a chamber in the form of a cylinder 10" (*id.* at p. 4:13). Furness further describes a "piston 13" mounted in the cylinder for pumping fluid from the chamber (*id.* at p. 4:16).

The positioning means element (d) of claim 1 is also disclosed by Furness. Furness describes a "stepper motor 23" that provides electronic pulses for moving a "lead screw 21"

(*id.* at p. 4:26-30) and describes his Figures as being shown in the "axial direction" (*id.* at p. 4:6-11). Figure 2 shows the stepper motor 23, the lead screw 21, the piston 13, and the chamber in axial alignment.

Furness also discloses two ports colored in green for aspirating and dispensing fluid, element (e). The port at the end of the chamber provides a passage for fluid into and out of the chamber, and the port on the seal leak unit provides a passage fluid flow. Thus, Furness explicitly discloses the use of two ports and teaches each claim element.[3]

Although Furness was cited curing the prosecution of the 562 patent, Furness was *not* considered because it was submitted after the final rejection and without the requisite fee. The Examiner indicated that he did not consider Furness by lining it out on the PTO 1449 form and not listing it on the face of the 562 patent. Unlike the prior art relied upon during prosecution (*i.e.*, Berlin, Menzies, Green, & Upton), Furness discloses all of the claimed

3 Even though Furness discloses the claimed ports and the patent owner admitted that it discloses the claimed ports, it may be argued that Furness does not disclose the claimed ports because the port on the seal leak unit is for dispensing fluid that leaks through the seal, but not aspirating. Any such argument should be rejected. The teachings of two ports and the admission are clear. Moreover, claim 1 does *not* specify that both ports have to aspirate and dispense. Rather, it merely requires two ports so that fluid can be aspirated through at least one and dispensed through at least one.

Furthermore, even if Furness is considered not to disclose two ports (which would be incorrect), Furness still anticipates. Furness teaches two "ports" 52, 53 through which fluid can be aspirated and dispensed (Furness p. at 9:3-15). Although these ports are not directly connected to the chamber, Claim 1 does not specify whether the ports must be directly or indirectly connected. Thus, the two ports 52, 53 can also be considered the two claimed ports.

Moreover, even if claim 1 is required to have 2 ports directly connected to the chamber and Furness is considered not to disclose those ports (both of which would be incorrect), it would have been an obvious design choice to modify Furness to have two ports directly connected to the chamber. Furness explicitly teaches the use of two ports for aspirating and dispensing fluid. Further, as described below, the benefits of two ports was well known in the art as taught by at least Clark 471, Clark 691, Yang, and Tanny, and it would have been obvious to modify Furness to have 2 ports extending directly from the chamber (*see infra* p.37-38).

features. Thus, Furness not only raises a substantial new question of patentability, but establishes that claim 1 should not have issued.

### 2. Claim 1 is anticipated by Yang

The Yang patent[4] (Ex. C) discloses each and every element of claim 1 of the 562 patent. Figure 2 of Yang has been colored and labeled below to show each and every element of claim 1.




FIGURE 2 OF YANG PATENT

As indicated in yellow in the previous figure, the Yang pump has a housing having a top wall, bottom wall, and side wall, with the bottom wall and side wall each having an inner surface. The top wall, bottom wall, and side wall enclose an interior. Thus, Yang discloses element (a) of claim 1.

---

4 Yang is prior art to the 562 patent under 35 U.S.C. § 102(e).

With respect to element (b) of claim 1, Yang's Figure 2 discloses a "seal 256" (Yang, Ex. C, at 11:33-35) that is held in an annular groove or recess in the interior of the side wall. This is the same structure that is disclosed in the 562 patent specification for carrying the seal. Therefore, the "carrying means" of element (b) of claim 1 of the 562 patent is disclosed.

Yang discloses an elongated chamber, designated "chamber 240," formed within the housing (*id.* at 11:4-5). This chamber is formed by the inner surface of the bottom wall, inner surface of the side wall, and the seal. The patent discloses that seal 256 "is for maintaining pressure within the chamber 240" (*id.* at 11:33-34). Yang further describes a "piston 228" reciprocally mounted in the chamber so that it can slide through the seal as stated in element (c of claim 1 (*id.* at Fig. 2, 10:7-10, 11:4-5; 11:30-33.)

Yang also discloses a motor "200" and expressly teaches that it can be a "stepping motor" (*id.* at 10:16-21). Yang further discloses a threaded rod or lead screw "206" that is driven by the stepper motor (*id.* at 10:23-24) and axial alignment between the stepping motor, lead screw, piston and chamber (*id.* at Fig. 2). The axially aligned stepping motor and lead screw function to accurately position the piston within the chamber so as to measure a fluid displacement; this is the same structure described in the 562 patent for performing the claimed positioning function. (*See generally*, *id.*, at 10:23-51.) Therefore, Yang discloses the claimed "positioning means" of element (d).

Although Yang expressly shows a lead screw (*i.e.*, a threaded rod) in Figure 2 and that is precisely what the 562 patent shows in Figure 2, the alleged patentee has argued in litigation that Yang lacks a "lead screw," because the term "lead screw" allegedly means more than just a threaded rod. The alleged 562 patentee argued that the claim term "lead screw" means a threaded rod and a specific nut type, a nut that does *not* use ball bearings. The 562 patent, however, does not claim and its specification does not even motion the word

"nut." They are utterly silent regarding nuts and types of nut. Yang discloses a lead screw that uses a nut having ball bearings. The alleged patentee's argument is erroneous and technically incorrect. A lead screw is nothing more than a threaded rod. A lead screw can be used with a nut that has ball bearings or a nut that does not have ball bearings. While the assembly of a lead screw and a nut that has ball bearings is sometimes referred to as a ball screw,[5] the use of a ball nut does not change the threaded rod; it is still a threaded rod or lead screw.[6] Thus, Yang's disclosure of a lead screw that uses a ball nut discloses the claimed lead screw.

Yang also discloses "two ports," shown in green in the previous figure, communicating with the interior of the chamber and providing a fluid pathway between the interior of the chamber and outside the chamber. These ports serve to aspirate and dispense fluids from the chamber; Yang discloses element (e) of claim 1 (Yang, Ex. C, at 10:10-13).

---

5 *E.g.*, Ex. O, Precision Machine Design by Prof. Alexander H. Slocum, Prentice Hall, p. 705, ¶ 6 (1992) (describing ball screws as a type of lead screw); Allington patent, Ex. P, at 8:61-62 (disclosing a pump in which a piston is driven by a stepper motor and a "lead screw 58," and further stating that "[t]he lead screw 58 is a ball screw"); Spence, Ex J, at 4:63-5:2 (describing a pump having an axially aligned piston and stepper motor as further having a "lead screw 10" and a zero-backlash ball nut 26").

6 Notably, during prosecution, the 562 patent applicant argued in his appeal brief that there is "no indication that the ball screw 17 of Menzies is equivalent to a lead screw" and "[t]here is no disclosure in Menzies that the ball screw 17 is capable of the fine gradations in linear movement which Applicant's lead screw provides" (Appeal Brief at 7) This argument had been previously rejected (Oct. 11, 1995 Office Action at 4). As the Examiner recognized, Menzies "[t]hreaded rod 20 is a lead screw." Moreover, claim 1 of the 562 patent does not claim, much less disclose, any "gradations," accuracy, precision, or any other specifics regarding the threads of the claimed lead screw. Therefore, "gradations" cannot be a basis for distinguishing the art.

Further, lead screws used with ball nuts (*i.e.*, ball screws) do in fact have high precision and extremely low backlash. Yang teaches a lead screw and ball nut that accurately displace the piston so that it can pump "8 *nanoliters* per step and 2.5 nanoliters per step, respectively" (Yang, Ex. C, at 8:12-17) (emphasis added).

Thus, Applicant's previously rejected arguments regarding Menzies are technically incorrect and legally irrelevant.

Kudo discloses element (a) of claim 1. As indicated in yellow in the previous figure, the Kudo pump has a housing having a top wall, bottom wall, and side walls, with the bottom wall and side wall each having an inner surface. The top wall, bottom wall, and side wall enclose an interior.

With respect to element (b) of claim 1, Kudo expressly shows an annular groove in the inner surface of the sidewall that carries a seal in Figure 1. This is the same structure that is disclosed in the 562 patent specification for carrying the seal. Although Kudo's text does not expressly identify the annular groove and seal, they are explicitly shown in the Figure. The seal is confirmed by Figs. 2 and 3 in Kudo (Ex. G), which show the piston sliding through a stationary seal. Thus, Kudo discloses the claimed "carrying means" of element (b) of claim 1.[8]

Kudo discloses an elongated chamber, designated "cylinder chamber 12," within the interior of the housing, formed by the inner surface of the bottom wall, inner surface of the side wall, and the seal (*id.* at Fig. 1 & p. 8 ¶3). A piston, referred to by Kudo as "plunger 11" (*id.*), is reciprocally mounted in the chamber and slides through the seal, as recited in element (c) of claim 1.

---

8 The possibility that Kudo has a dynamic seal disposed on the piston itself as opposed to in an annular groove disposed in the chamber side wall is excluded by Kudo's teachings. First, Kudo does not show a seal on the piston; Kudo shows the seal in the chamber side wall. Second, the presence of a seal on the piston, as opposed to in the wall, is excluded by Kudo's discussion of the pump's flow rate being dependent upon the piston's diameter (Kudo, Ex. G, at p. 7, ¶ 7- 8, p.8 ¶1). If the seal were on the piston itself, the pump's flow rate would be dependent on the chamber's diameter, not the piston's diameter.

Despite the teachings of Kudo, the patentee may contend that Kudo discloses a design having no seal in which the piston and chamber are machined precisely so that no seal is needed. This is incorrect. Kudo shows a seal and teaches nothing whatsoever about precision machining.

But even if true, it would have been obvious to employ the seal and annular groove seal carrying means of Nichols (Ex. F), Dourdeville (Ex. D), Furness (Ex. B), and Buzza EPO (Ex. I) in Kudo because the use of a seal carried by an annular groove was a well-known design choice in fluid displacement pumps dating back at least to the 1970's, if not well before that.

With respect to element (b) of claim 1, Dourdeville discloses a "self-energizing seal [5a]," which, as shown in the figure, is held in an annular groove (referred to by Dourdeville as a "cavity") in the inner surface of the sidewall (Dourd., Ex. H, at 5:24-28). This is the same structure that is disclosed in the 562 patent specification for carrying the seal. Therefore, the "carrying means" of element (b) of claim 1 of the 562 patent is disclosed.

Dourdeville also discloses an elongated bore-like chamber formed within a part of the cylindrical housing, which is designated "3a" (Dourd., Ex. H, at Fig. 1 & 5:22-24). This chamber is formed by the inner surface of the bottom wall, the inner surface of the side wall of cylinder 3a, and the seal. "[P]iston 1a" (*id.* at 5:23) provides "positive displacement" pumping action by being mounted such that its linear motion will "sweep out a volume" within the chamber (*id.* at 5:22-24). Dourdeville's seal "interface[s] with the outer diameter of the piston" during this pumping action (*id.* at 5:27-28). Thus, Dourdeville expressly discloses a piston reciprocally mounted in the chamber and sliding through the seal, as stated in element (c) of claim 1 of the 562 patent.

Dourdeville also explicitly teaches and depicts an axially aligned stepper motor, lead screw, and piston, the claimed positioning means. Figure 1 depicts these features, and Dourdeville further states "[t]he force to drive the piston is derived from a *step motor* 7a, the rotary motion of which is converted to linear motion by a *lead-screw* spindle 9a, and nut 11 arrangement" (*id.* at 5:28-31) (emphasis added). Dourdeville further states "step motor 7a" and "lead-screw spindle 9a," drive the piston and provide "precise *axial alignment* of the driven end of the piston" (*id.* at 5:28-45) (emphasis added). Accordingly, the axially aligned stepper motor and lead screw perform the function of accurately positioning the piston within the chamber so as to measure a fluid displacement, which are the same structure described in the 562 patent for performing the positioning function of element (d) of claim 1. Therefore, Dourdeville discloses the claimed "positioning means" of element (d).

Dourdeville discloses two "ports" (*id.* at 5:48-50), shown in green in the previous figure, that communicate with the interior of the chamber and provide a fluid pathway for aspirating and dispensing fluids from the chamber. Dourdeville discloses element (e).

Unlike Berlin, Menzies, Green, and Upton, Dourdeville discloses each claim element. Thus, Dourdeville raises a substantial new question of patentability.

**5. Claim 1 is anticipated by both Clark patents or obvious over either Clark patent in combination with any of Douderville, Nichols, Buzza EPO, Yang or Spence.**

The related Clark 471 and 691 patents (Ex. D, E) each anticipate claim 1 of the 562 patent because they both disclose each element of claim 1.[10] Figure 26 of the Clark 471 patent and Figure 9 of the 691 patent both disclose a fluid displacement pump that has a housing, an axially aligned stepper motor, lead screw, piston, chamber, an annular groove that carries a seal, and two ports for aspirating and dispensing fluid from the chamber. Each of the corresponding claim elements are shown in the Clark figures reproduced below, which have been colored and labeled.

[10] Abbott's related U.S. Patent Nos. 4,536,471 and 5,358,691 both issued to Clark from applications filed before the 562 Patent was filed. They are, therefore, prior art with respect to the 562 Patent under 35 U.S.C. § 102(e). To the extent that the patentee alleges priority with respect to these patents, *see supra* n. 9.




FIGURE 9 OF CLARK 691 PATENT




FIGURE 26 OF CLARK 471 PATENT

Both Clark patents discloses a fluid displacement pump, referred to as a dispensing "syringe" (*e.g.*, Clark 471, Ex. D, at 41:55-56; Clark 691, Ex. E, at 21:7). As indicated in

yellow, the Clark pumps have a housing having a top wall, bottom wall, and side wall, with the bottom wall and side wall each having an inner surface. The top wall, bottom wall, and side wall enclose an interior; the Clark patents each disclose element (a) of claim 1.

With respect to element (b) of claim 1, the Clark patent Figures disclose a "seal 126" (Clark 691, Ex. E, at 21:21, Clark 471, Ex. E., at 42:14-17), which is held in an annular groove in the inner surface of the sidewall. Likewise, the 562 patent discloses an annular groove as its seal carrying means. Therefore, the "carrying means" element of the 562 patent is fully disclosed by both Clark patents.

Both Clark patents disclose an elongated chamber, referred to as a "bore 128." (See Clark 691, Ex. E, at Fig 9 & 21:27; Clark 471, Ex. D., at Fig. 26 & 42:1-3). This chamber is defined by the inner surface of the bottom wall, inner surface of the side wall, and the seal. A "piston 124" mounted in the chamber "reciprocates through a seal 126," as recited in element (c) of claim 1 (Clark 691, Ex. E, at 21:20-21 & Clark 471, Ex. D, at 42:1-3).

Both Clark patents also disclose a stepper motor and a lead screw that are axially aligned with the piston as recited in element (d). Clark 471 specifically recites "mating lead screw 137" (Clark 471, Ex. D, at 43:25-27), and just like the Clark 471 patent, the Clark 691 expressly shows a lead screw with helical threads in the Figures. Figures 9 and 26 respectively show axial alignment between the chamber, piston, lead screw, and motor. Both patents also disclose a stepper motor which is colored orange. In this regard, the Clark 691 and 471 patents both specifically state that the technologies incorporated into the disclosed automated analytical system use stepper motors (Clark 691, Ex. E, at 15:22; Clark 471, Ex. D, at 21:33-34), and no other kinds of motors are mentioned in the patents.[11] In fact, Clark

[11] Elsewhere, the Clark 691 patent discloses specific examples in which motion control is accomplished by stepper motors (Clark 691, Ex. E, at 19:19-20; 20:6-20, 58-59; 23:6, 15; 23:23-24; col. 23: 35), and the patent uses the words "motor" and "stepper motor" to refer to

471 states that "[m]otion control for the system 2 is performed by 22 stepper motors of various sizes, some of which are identified herein" (Clark 471, Ex. D, at 21:33-35). Thus, the "positioning means" of element (d) of claim 1 of the 562 patent is fully disclosed in the Clark patents.[12]

Both Clark patents disclose two ports, referred to as "fluid entry port 134" and "fluid exit port 136" (Clark 691, Ex. E, at 21:25-31, Clark 471, Ex. D, 42:6-12). These ports are for aspirating and dispensing fluid from the chamber, as recited in element (e) of claim 1 (*id.*; Clark 471, Ex. D, at 41:55-57).

It may be argued that even though the Clark patents both show an annular groove that carries a seal through which a piston reciprocates, the Clark patents lack the claimed "means for carrying the seal." The alleged patentee may argue that the means for carrying element is

---

the same component (*Compare e.g.*, Clark 691, Ex. E, at 20:58-59, *with* 21:2). Further, one of ordinary skill in the art would necessarily understand that the Clark patents necessarily disclose a stepper motor driven pump because the only other reasonable possibility is a DC servo motor and such a motor is definitively not disclosed. Unlike a stepper motor, which may or may not be used with a rotational position sensor, a DC servomotor used for accurate positioning *requires* a rotational position sensor mounted on the motor shaft, such as an encoder. The Clark patents do *not* mention, and their drawings depicting the motors do *not* show, an encoder or similar sensor, as it would show if the motor were a DC servomotor. Accordingly, one of ordinary skill in the art would recognize that the illustrated motors are stepper motors and not DC servo motors.

[12] Both of the Clark Patents disclose a stepper motor as the means for accurately positioning the piston within the chamber. However, in the event that either of the Clark Patents were found not to disclose the use of a stepper motor, claim 1 would nevertheless have been obvious in light of either patent and any of the other prior art references described in this request which disclose a stepper motor for accurately positioning a piston within the chamber of a pump. One of ordinary skill in the art would be motivated to use a stepper motor to position the piston in the pump due to the inherent reliability and simple control electronics of stepper motors, along with their accuracy and repeatability for precise positioning (*e.g.*, Tanny, Ex. K, at 10:47-49, referring to the fact that a stepper motor is preferred because it "provides very accurate positional control at low cost;" Spence, Ex. J, at 1:18-25, pointing out that most syringe pumps use stepper motors to drive the piston because they allow a "simple, digitally-controlled open-loop plunger drive mechanism having a resolution defined by the number of steps per revolution of the stepping motor and the pitch of the lead screw").

limited to an annular groove and because the Clark patents disclose a seal assembly (*i.e.*, a seal, a backup ring and a spring) in addition to a groove, the Clark patents lack the claimed means for carrying. According to the alleged patentee, in the Clark patents an *annular groove*, backup ring and spring perform the recited seal carrying function and they are not equivalent to the *annular groove* disclosed in the specification for performing the carrying function. This argument is wrong for several reasons.

First, the backup ring and spring are part of a seal assembly, not the means for carrying the seal. Claim 1 merely requires a seal and places no restrictions on the seal geometry and the type of seal. The differences between the details of the seal assembly (*i.e.*, the spring and backup ring) in the Clark Patents and the generic seal, the specifics of which are not disclosed, in the 562 Patent are irrelevant. The Clark patents still define an annular groove that carries the seal just as in the 562 patent.

Second, unlike the annular groove, the spring and backup ring in the Clark Patents do not serve the purpose of carrying the seal. Rather, they simply keep the seal from moving axially within the groove during operation; a function that is not specified in claim 1. Even without the spring, the seal in the Clark patents would be carried by the annular groove.

Moreover, in the event that the backup ring and spring are considered to carry the seal, the use of a groove, ring and spring is equivalent to a groove for purposes of performing the function of carrying a seal. Notably, when the prior art element performs the function specified in the claim, and is not excluded by any explicit definition, which is the case here, equivalents under 35 U.S.C. § 112, paragraph 6, should be inferred (MPEP §2183). Thus, there is still anticipation under 35 U.S.C. § 112, paragraph 6.

Both Clark patents disclose each of the claimed features. In the event, however, that it is found (and it should not be) that the Clark patents lack the claimed seal carrying means,

claim 1 is still invalid as obvious over either Clark patent when combined with any of Dourdeville (Ex. H), Nichols (Ex. F), or Buzza EPO (Ex. I). Each of these prior art references discloses a seal carried by an annular groove. The use of an annular groove to carry a seal was well-known in the art, and it would have been a mere design choice to include just an annular groove or an annular groove and additional structure.

Neither Clark patent was considered during the prosecution of the 562 patent and both Clark patents anticipate claim 1. Thus, they are more pertinent than Berlin, Menzies, Green and Upton, and they each raise substantial new questions of patentability.

### 6. Claim 1 is obvious over Buzza EPO and Buzza 998

Both Buzza references are prior art to the 562 patent under 35 U.S.C. § 102(b).[13] Buzza's 1981 EPO reference explicitly discloses each element of claim 1 except a stepper motor and lead screw that are axially aligned with the piston. Buzza's later 998 patent, however, expressly teaches these pump features, and the combination of the two Buzza references renders claim 1 obvious. Figure 1 of Buzza EPO is reproduced below with color coding and labels to show the disclosed elements of claim 1 of the 562 patent. Although applicant only seeks reexamination of claim 1, Buzza EPO casts doubt on the patentability of all of the 562 patent's claims because it discloses a stepped piston.

[13] Buzza's EPO publication number 0 039 146 published on April 11, 1981 and is prior art under 35 U.S.C. § 102(b). Buzza's U.S. Patent No. 4,888,998 issued on December 26, 1989 and is prior art under 35 U.S.C. § 102(b).



FIG. 1

As indicated in yellow, Buzza's EPO pump has a housing having a top wall, bottom wall, and side wall, with the bottom wall and side wall each having an inner surface. The top wall, bottom wall, and side wall enclose an interior, as stated in element (a) of claim 1, which includes a chamber occupied by the piston.

With respect to element (b) of claim 1, Buzza's EPO pump discloses a "[a] seal 22 [that] cooperates with second piston portion 15 to substantially seal second chamber 13 from first chamber 12" (Buzza EPO, Ex. I, at p. 3:13-15). Further, Buzza's EPO Figure 1 expressly shows an annular groove for carrying the seal 22. This is the same structure that is

disclosed in the 562 patent specification for carrying the seal. Therefore, Buzza EPO teaches the "carrying means" of element (b).

Buzza EPO also discloses a piston (*i.e.* "second piston portion 15") coupled to a "reciprocating drive" (not shown) (p. at 3:5-7) and a seal 22 that "cooperates with second piston portion 15 to substantially seal second chamber 13 (*id.* at p. 3:13-15). Thus, Buzza EPO discloses a piston that is reciprocally mounted in the chamber and slides through the seal, as claimed in element (c).

Buzza EPO also discloses two ports, "inlet port 18" and "outlet port 19," for aspirating and dispensing fluid from the chamber 13 (*id.*, at p. 3:15-16). Thus, Buzza EPO discloses element (e) of claim 1.

Although Buzza EPO teaches that the piston is coupled to a "reciprocating drive," Buzza EPO does not provide a further description of the reciprocating drive. Thus, Buzza EPO expressly discloses each element of claim 1 of the 562 patent except clause (d) ("wherein the positioning means further comprises a stepper motor and a lead screw" and "wherein the positioning means is substantially axially aligned with the piston and the chamber").

Buzza's later 998 patent, however, discloses clause (d)'s elements. Buzza's 998 patent illustrates in Figure 1 "a displacement pump 43 adapted to aspirate fluids such as samples" (998 patent, Ex. L, at 3:22-23). Buzza 998 describes the pump 43 as being "actuated by a *stepper motor* 44 acting through a *lead screw* 45 which in turn displaces *a piston* within the *chamber* 43a, all in a conventional fashion" (*id.* at 3:27-29) (emphasis added). As shown in the annotated Figure 1 of the 998 patent reproduced below, Buzza 998 explicitly shows the stepper motor 44, and the lead

screw 45 axially aligned with the chamber 43a and two ports for aspirating and dispensing liquid.




Thus, the combination of the two Buzza references renders claim 1 of the 562 patent obvious. Buzza's EPO reference discloses the internals of the claimed pump and all but the pump drive mechanism (*i.e*, the stepper motor, lead screw, and axial alignment). Buzza's later 998 patent, however, discloses the pump driving means, but not the pump internals (*i.e.*, seal and the means for carrying the seal). Merely, using Buzza's 998 patent's stepper motor, lead screw, and axial alignment as the drive mechanism for Buzza's EPO pump yields the claimed invention. Figure 2 from Buzza's EPO reference has been combined with the drive mechanism from Buzza's 998 patent in the Figure below to show the combination of the two references and the claimed invention.




There is motivation to combine the two Buzza references. First, they share a common inventor, Mr. Edmund Buzza, and were originally assigned to the very same company, Beckman Instruments, Inc. Second, there is motivation because Buzza's EPO reference states a preference for a single drive source (Buzza EPO, Ex. I, at p. 5:20-27). Buzza's 998 patent discloses such a single drive source in the form of an axially aligned stepper motor and lead screw. Further, the pumps disclosed in both patents have the same purposes. Buzza EPO states that it "relates to a fluid control system in a measuring and testing instrument" and liquid handling (Buzza EPO, Ex. I, at p. 1:5-7; 12-14). Likewise, the pump disclosed in Buzza 998 is used in a "sampling handling system" (998, Ex. L, at 2:48-49; Fig. 1) for analytical instruments that measure and test (*id.* at 1:11-62). Thus, one skilled in the art

reading the Buzza prior art before April 1994 would have been motivated to combine the Buzza references to form the claimed pump.[14]

### 6. Claim is obvious over Nichols alone or Nichols in combination with any of Yang, Tanny, Dourdeville, Clark 471 or Clark 691

The Nichols Patent[15] describes each and every element of claim with the possible exception of the two port limitation. Nichols discloses a pump for performing chemical procedures and automated pumping of reagents in immunoassay systems (Nichols at 1:13-15, 28-34). Provided below is a colored and labeled version of Figure 3 of Nichols showing the elements recited in claim 1 of the 562 Patent.

---

[14] Even if one did not combine the Buzza references, claim 1 would still have been obvious over Buzza EPO and Spence. Spence expressly teaches the advantages of axially aligning the stepper motor, lead screw, piston and chamber (Ex., J at 1:18-65, referring to the limitations of offset configurations which "may cause flexing of the links that connect the plunger to the lead screw, warping of the plunger itself and/or warping of the syringe barrel, resulting in inaccurate deliveries and leakage" and stating that "these designs also have substantial hysteresis, making them unusable for precision infusion/extraction applications"). Therefore, one skilled in the art would have been motivated to use the reciprocating drive means of the Spence Patent to accurately positioning the piston within the chamber of the Buzza EPO application to form the claimed invention.

[15] Nichols is prior art to the 562 patent under 35 U.S.C. § 102(b).




As shown in yellow in Figure 3, Nichols discloses the 562 patent's claimed housing recited in element (a). The Nichols pump has a housing that includes a top wall, a bottom wall and side wall, each having an inner surface; the top wall, bottom wall and side wall enclosing an interior therebetween.

Just as in claim 1 of the 562 patent, Nichols also contains an annular groove in the side wall for carrying a seal 30 therein (Nichols, Ex. F, at 3:27-28), and as shown in Figure 3

an elongated chamber is formed by the inner surface of the bottom wall, inner surface of the side wall and the seal. Further, the Nichols pump also includes a reciprocally mounted piston 35 which slides through the seal 30 to aspirate and dispense fluid (*id.* at 4:16-23). Thus, Nichols discloses elements (b) and (c) of claim 1.

Nichols further teaches a pump positioning means that comprises a "reversible stepping motor" (*id.* at 3:10 & 5:24-44) and lead screw (*id.* at 3:36). Nichols also discloses axial alignment (Fig. 3). The embodiments shown in figures 3 and 4 and discussed at column 4, lines 5-7 (referred to by Nichols, Ex. F, at 4:16-19 as a "syringe type pump") have a stepper motor that is axially aligned with the piston and the chamber.[16] Further, Nichols states that instead of a pulley/belt drive mechanism as shown in the other Nichols embodiments "the drive connection to the pump may be ***directly*** thought the drive shaft axle 50" (*i.e.*, axially aligned) (Ex. F at 4:5-7) (emphasis added). Thus, Nichols discloses element (d) of claim 1.[17]

Figure 3 of the Nichols patent shows one port directly connected to the chamber below reference numeral 72 for aspirating and dispensing fluid from the chamber. Nichols also discloses two ports in rotary valve 75 proximal to reference numerals 76, 81, for aspirating and dispensing fluid from the chamber. These two ports are not, however, directly connected to the chamber. Rather, they are connected to the chamber by a single port. Claim 1 does not, however, specify whether the ports must be directly or indirectly connected.

If claim 1 is considered to require two ports directly connected to the chamber (even though the claim does not specify the connection type), it would have been obvious to one

---

16 Note that Figure 3 is exaggerated to show a misalignment (*i.e.*, the piston at an angle) because one of the Figure's intent is to explain the benefits of the drive configuration if there is a slight unintended misalignment.

17 Even if Nichols is considered not to teach axial alignment (which would be incorrect), claim 1 would still be invalid as obvious when Nichols is combined with Spence (Ex. J), which expressly discloses the benefits of axial alignment (*see supra* n.14).

skilled in the art to directly connect the two ports (*i.e.*, the 2 ports in the rotary valve (figure 3) or the 2 ports in the downstream tubing (figure 6)) employed by Nichols so that fluid could be aspirated or dispensed directly from two chamber ports. The use of 2 ports was a well-known design choice. It is a mere design choice to use either two ports directly connected to the chamber or one direct port splitting into two ports. The use of two ports in a pump—a device that has been used to aspirate and dispense fluid for well over 100 years—is not a patentable distinction.[18]

In Summary, Nichols alone or in combination with other art raises substantial new questions regarding the patentability of claim 1 over the prior art.

**8. Claim 1 is obvious over Snodgrass in Combination with Any of Yang, Tanny or Clark**

Snodgrass discloses a fluid dispensing system for precise delivery of fluids and discloses all of the elements of claim 1 except possibly the two port limitation; Snodgrass discloses one port directly connected to the chamber. If claim 1 is can considered limited to two direct ports (which would be incorrect), it would have been obvious to combine Snodgrass with any of Yang, Tanny or either Clark patents to modify the Snodgrass pump to have two direct ports. These references disclose pumps having two ports and the benefits of two ports. Figure 2 of Snodgrass Patent has been colored and labeled below to identify the elements recited of claim 1 of the 562 Patent.

---

[18] In fact, any technical advantages for using two directly connected ports were known. For example, as shown in Yang (Ex. C), Tanny (Ex. K) and the Clark patents (Exs. B, C) two directly connected ports allows check valves to be incorporated proximal to the chamber. One skilled in the art would have known that this would be advantageous in reducing the amount of dead volume. Reduction of dead volume serves to minimize the potential for trapping bubbles in the system as well as reduces carryover due to stagnant areas within the system (*e.g.*, Clark 691. Ex. E, at 21:54-59).




As indicated in yellow, the Snodgrass pump includes a housing (Snod., Ex. M, at 4:51-55) having a top wall, a bottom wall and side wall each having an inner surface; the top wall, bottom wall and side wall enclosing an interior. Thus, Snodgrass discloses element (a).

Snodgrass also describes "Teflon scraper seals 86." as being "retained in annular grooves in the wall of cylinder 64 to prevent fluid leakage" (*id.* at 5:18-23). Snodgrass' further describes his pump as having a "chamber 68" and "a slidably disposed" piston 66 (*id.* at 4:66-5:1 & 5:32-34) that "reciprocates in cylinder 64" through seals 86 (*id.* at 5:16-23). Thus, Snodgrass discloses elements (b) and (c) of claim 1.

Snodgrass discloses element (d) of claim 1. Specifically, Snodgrass has an "electronic stepper motor 62" (*id.* at 4:54) whose "rotation causes corresponding linear

movement of piston 66 in cylinder 64" (*id.* at 5:24-28). Snodgrass further discloses a threaded "drive 80" or lead screw that is axial aligned with the stepper motor 72, piston 66, and chamber 68 (*id.* 5:2-13).

Snodgrass discloses one "port 69" (*id.* at 5:36-37) in direct communication with the chamber for aspirating and dispensing fluid because its specific application is with a diaphragm slave pump having two ports. Snodgrass also explicitly discloses the use of two ports (*i.e.*, "inlet and outlet passages" 188, 189). If claim 1 is considered to be limited to a pump having 2 ports directly connected to the chamber, then it would have been obvious to modify Snodgrass to include two direct ports. If one skilled in the art were to use the teaching of the Snodgrass Patent in other applications (*e.g.*, for the precise aspiration and dispense of fluids used in a medical instrument), it would have been obvious to incorporate the two ports into the chamber, as disclosed by Snodgrass itself, Yang, Berlin, the Clark patents or Tanny. As described above with reference to the Nichols patent the use and advantages of two ports was well-known prior to 1994, and it would have been obvious design choice to modify Snodgrass to have two ports directly connected to the chamber.

**9. Claim 1 is obvious over Tanny in combination with any of Dourdeville, Yang, or Nichols**

Tanny discloses a rotary/reciprocating liquid dispensing pump for the medical and pharmaceutical industries (Tanny, Ex. K, at 1:18-20) and discloses each element of claim 1 with the possible exception of the seal specified by clause (b). It would have been obvious, however, to one skilled in the art to modify Tanny to incorporate a seal through which the piston slides as disclosed in the Yang, Dourdeville, and Nichols Patents. Figure 1 of the Tanny Patent has been annotated below to show the elements recited in claim 1 of the 562 Patent.




As shown in Figure 1, the housing includes a top wall, a bottom wall and side wall each having an inner surface; the top wall, bottom wall and side wall enclosing an interior therebetween. Tanny also describes an "axial bore 50" or chamber (Tanny, Ex. K, at 3:4) and a piston 15 that slides in the chamber. Tanny further describes a "stepper motor 22" and "lead screw 21" (*id.* at 2:1- 57 & 5: 1-37) that are axially aligned with the piston 15 and the chamber 50. Tanny also includes two ports for aspirating and dispensing fluid from the chamber as shown in Figure 1. Although Tanny discloses an annular groove, Tanny has a liner 11 disposed in the annular groove. If the liner is not considered a seal, then Tanny discloses all of the elements of claim 1 except the seal.

It would have been obvious, however, to one skilled in the art to modify Tanny to include a seal disposed in an annular groove as disclosed in the Yang, Dourdeville, or Nichols. One skilled in the art would certainly understand the complexity of making and

maintaining a precision ground piston and close fitting chamber liner that did not leak as disclosed in Tanny. Using a seal carried in an annular groove would render the design of the Tanny Patent more cost effective and maintenance would involve merely changing the seal, rather than the entire piston and cylinder chamber. Thus, one skilled in the art would be motivated to replace the precision machined liner of the Tanny Patent with a seal carried in a groove in the side wall.

**10. The 562 patent does not claim, much less disclose a specific nut that is used with the lead screw, and therefore any argument by the alleged patentee to limit the claim to a specific nut configuration should be rejected**

Claim 1 of the 562 patent recites a "positioning means" that comprises an axially aligned stepper motor and lead screw. Assuming the positioning means clause is a means-plus-function clause, the patent applicant had a mandated statutory duty to specify the corresponding structure and specifically link that structure to the recited "positioning" function. The 562 patent specification states that "the positioning means 40 comprises linear actuator or a stepper motor 42 and a lead screw 44, the lead screw being connected to the piston 38" (562 patent, Ex. A, at 2:48-50; 3:23-29). The patent specification further states that in a preferred embodiment the "positioning means is substantially axially aligned with the chamber 32 and the piston 38" (*id.* at 2:51-53). Thus, the only *structure* disclosed for performing the positioning function is an axially aligned stepper motor, lead screw, and piston.

The 562 patent provides no discussion whatsoever of how the lead screw and piston are "connected," what structure is used to make that connection (*e.g.*, threads, a nut, a coupling, etc . . . ), whether the lead screw piston connection is direct or indirect, whether or how a nut is used with the lead screw, what type of nut is used with the lead screw, whether an anti-rotation guide is used, whether the lead screw turns or merely translates, how the

stepper motor and lead screw are connected, or whether a nut is disposed in the stepper motor. There is simply no written description of any other corresponding structure. Thus, in order to find the claimed positioning means in the art during reexamination, the Examiner need only find an axially aligned stepper motor, lead screw, and piston or an equivalent that perform the claimed positioning function. With the exception of the Buzza EPO reference, all of the prior art references described above have an axially aligned stepper motor, lead screw, piston, and chamber wherein the lead screw is connected to the piston for performing the claimed positioning function.

When faced with anticipatory art during litigation, however, the alleged patentee asserted that claim 1 is more limited than that set forth in either the claim or the specification, and he may do the same here. If he does, his argument should be rejected. In order to avoid this art, the alleged patentee argued that the claimed "positioning means" is limited to one specific type of stepper motor, lead screw, and piston arrangement, a so-called "turn-nut" arrangement. In a turn-nut configuration, the stepper motor turns a nut, which may be disposed in the stepper motor, while the lead screw translates and does not rotate, to cause motion of the piston. In contrast, in a "turn-screw" configuration the stepper motor turns the lead screw, the nut translates and does not rotate, to cause motion of the piston. To avoid certain prior art, the alleged patentee has somehow turned the word "connected" from the specification into the term "turn-nut" to the exclusion of "turn-screw" and argued that the 562 patent's corresponding structure for the claimed "positioning means" includes a "turn-nut" configuration.[19] The alleged patentee has further alleged that a turn-nut configuration is not equivalent to a turn-screw configuration under 35 U.S.C. § 112, paragraph 6.[20]

---

19 *Id.*

20 *Id.*

If asserted here, the alleged patentee's argument should be rejected in the reexamination proceeding for several reasons. First, such a construction violates 35 U.S.C. § 112, paragraph 6's, requirement to disclose the corresponding structure.[21] If the "positioning means" element is a means-plus-function clause, then the applicant was *required* to specify the corresponding structure. The 562 patent *does not* use the term "nut," *does not mention* much less explain a turn-nut or turn-screw configuration, *does not* specify which part rotates the screw or the nut, *does not* disclaim any connection type, *does not* disclaim a turn-screw configuration, *does not* show the internals of how the lead screw connects to either the piston or the stepper motor; *does not* state whether there is or is not a nut in the stepper motor, as may be found in a turn-nut configuration; and *does not* show *any details* of how the stepper motor, lead screw, and piston are connected.

In fact, an expert in the field has modified Figure 2 of the 562 patent to show that one skilled in the art would understand, that various connections, including either the turn-nut or turn-screw configuration, could be used with the Giter 562 patent and that neither is specified (Ex. X, Excerpts from Hendrick Dec. at ¶¶34-35, and Ex. F to Hendrick's Declaration). The possibilities include direct connections that are either turn-nut or turn-screw. Thus, any argument that the term "connected" means one of the two configurations is just wrong. The alleged patentee's attempt to limit the claims to a turn-nut configuration is nothing more than a litigation induced argument that was spurred by certain anticipatory prior art. The 562 patent simply says nothing about how any nut connection type is related to the alleged

---

[21] *Kemc Sales, Inc. v. Control Papers Co.,* 208 F.3d 1352, 1360(Fed. Cir. 2000) (35 U.S.C. § 112, paragraph 6, embodies "a statutory *quid pro quo*" and applicant must disclose adequate structure).

invention. The alleged patentee's argument violates the means-plus-function *quid pro quo* because a "connection" type is simply not disclosed.[22]

Second, engrafting a "turn-nut" limitation onto the claim would violate 35 U.S.C. § 112, paragraph 1's, written description requirement. The specification is silent regarding how the piston, lead screw, and piston are connected, what type of structure is used to connect the lead screw and piston (*e,g.*, threads, a nut, couplings, or other structure), how the stepper motor is connected to the lead screw (*e.g*, threads, a nut, couplings or other structure), whether a nut of any type is used and how it is used. There is simply no written description of a turn-nut configuration in "full," "clear, "exact, and concise" terms that satisfies 35 U.S.C. § 112, paragraph 6's mandate.

Furthermore, any attempt by the alleged patentee to limit the claims to a nut located in specific place or a certain stepper motor, lead screw, nut configuration is expressly prohibited by the prohibition against adding new matter. MPEP §2250 ("amendments may *not* introduce new matter"). Since the 562 patent does not provide any details of the stepper motor, lead screw, piston construction and describe any other structure, the alleged patentee is prohibited from adding it now.

22 The Court stated that it construes the positioning means clause as "comprising a stepper motor and a lead screw that is connected to the piston, and equivalents thereof." (Ex. Q at 14). The Court also stated that "[c]laim 1 uses a 'turn-nut' configuration in which the nut *turns the lead screw* while the lead screw moves up and down" (*id.*) (emphasis added). The import of this statement is not clear because a turn-nut configuration does not turn the lead screw, it turns the nut. Nevertheless, any rulings by the Court on issues of claim construction are *not* binding on the patent office because the Court and the patent office apply different standards. *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1378 (Fed. Cir. 2003) (explaining the requirement that the patent office construed claims as broad as reasonably possible because of the difference in assessing patentability in the patent office and validity of an issue patent). The patent office is required to construe claims as broad as reasonably possible, while a Court is not. Thus, during a reexamination proceeding, the patent office is free to ascertain its own meaning of the claims (MPEP §2286).

Third, the patent office is required in its analysis to give claims their broadest possible interpretation. The broadest possible interpretation of the claimed "positioning means" is an axially aligned stepper motor, lead screw, and piston connected by any means whether it be direct, indirect, or characterized in another way. The patent office should not write a limitation, that the inventor failed to disclose, into the claims.

In summary, the patent specification recites only an axially aligned stepper motor, lead screw, and piston that perform the claimed "positioning function." If the alleged patentee asserts that the claim is more limited, its argument should be rejected because there is no disclosure. If it is accepted, then the claim should be rejected for violating the written description requirement.

Even if, however, claim 1 is considered to be limited to a turn-nut configuration (it should not be so limited), the prior art is replete with turn-nut configurations. For example, at least Clark 471, Clark 691, Dourdeville, Tanny, and Nichols all disclose turn-nut configurations and therefore still anticipate or render obvious claim 1 under the analysis set forth above.

Moreover, even if claim 1 is somehow considered to be limited to one specific connection type, *i.e.* turn-nut, (which it should not be) claim 1 is still invalid over any turn-screw art discussed above because one of ordinary skill in the art in the pump art would have known that either a turn-nut or turn-screw connection could have been used to move the piston and the two are equivalents under section 112. Spence (Ex. J) expressly recognizes their known equivalency and states "[m]ost syringe pumps use a stepping motor to turn a lead screw" (*i.e.* turn screw) "or its mating nut" (*i.e.*, turn nut) "to drive the syringe" (Spence, Ex. J, at 1:19-20). The differences are minor--turn the screw and translate the nut or translate the screw and turn the nut—and are elementary mechanical engineering. In fact, the 562 patent

even states that "other equivalent positioning means 40" may be used (562 patent, Ex. A, at 4:27).

Further, both configurations were well-known, and it would have been an obvious design choice to select one over the other. During litigation, Mr. Volovik's technical expert even admitted both configurations were well-known:

> Q. Okay. I take it as you understand it, one skilled in the art would know that the combination of a threaded shaft and a nut could be used to convert rotary motion from a motor into linear motion to position a piston in either one of two ways.
> A. Correct.
> Q. Okay. And one of those ways the threaded shaft is directly connected to the piston and the motor turns the nut, which linearly moves the shaft and the piston, which you referred to as the turn-nut configuration?
> A. Correct.
> Q. And the other approach the threaded shaft is connected to the piston by means of a nut and the motor turns the shaft, which linearly moves the nut and the piston, which you refer to as the turn-screw configuration?
> A. Correct.
> Q. Now were both of these methods of converting rotary motion from a motor to linear motion to position a piston known in the prior art?
> A. Yes.

(Durfee Dep., Ex. R, at 45:23-46:19). Moreover, in 1978 Nichols disclosed motivation to select a turn-nut arrangement, including advantages in relative size, mitigation of misalignment, and lubrication (Nichols, Ex. F, at 2:3-8).[23] The alleged patentee's technical

---

[23] According to Nichols, in a turn-nut configuration "the distance between the nut and the seal between the piston and chamber remains the same regardless of the relative position of the piston." (Nichols, Ex. F, 2:3-8). Nichols further teaches that if the piston becomes misaligned in a turn-nut configuration "the seal may move to an off-center position but does not thereafter continually change position as is the case with the prior art devices" which have a turn-screw configuration (*id.* at 2:15-19). In addition, Nichols teaches that in a turn-nut configuration "the lead screw may be easily and continuously lubricated since the lead

expert, Dr. Durfee, further admitted that Nichols provides the motivation to use the well-known turn-nut configuration. Dr. Durfee admitted at his deposition:

> Q. As I understand it, then, people skilled in the art knew that the -- what you called the turn-nut configuration resulted in a more compact pump?
> A. Yes.
> Q. And those skilled in the art also knew that the turn-nut configuration would reduce seal wear on the piston seal?
> A. That's the Nichols '624 patent puts the -- says that that's one of the advantages of the turn-nut configuration.
> Q. Okay. Do you agree?
> A. The argument described in Nichols makes sense, yes.
> Q. Okay. So if someone were developing a pump then and wanted to have a more compact pump or reduce the piston seal wear, they'd be motivated to use the turn-nut configuration rather than the turn-screw configuration, turn -- threaded shaft configuration?
> A. That seemed to --
> Reducing seal wear and making a compact pump seemed to be what motivated the inventors of the '562 patent.
> Q. And in general people skilled in the art would have that motivation.
> A. You mean in general would have what motivation?
> Q. Yeah. Somebody skilled in the art, not looking at the inventor of the '562 patent --
> A. Umm-hmm.
> Q. -- in particular, just somebody of skill in the art, if they were trying to develop a pump that was more compact and had reduced piston seal wear, would that person be motiv -- motivated to use the turn-nut configuration rather than the turn lead screw configuration?
> A. If those two were --
> If the desire were to reduce seal wear in the particular configuration of seal that we're discussing, and if the desire was to make the pump more compact, then -- then one would tend to use the turn-nut configuration.

---

nut, which is not reciprocated, includes a lubricant chamber into which the lead screw moves" (*id.* at 2:3-8; 15-19; 29-34).

(Durfee Dep., Ex. R, at 48:10-49:24).[24] Thus, even if claim 1 is considered limited to a turn-nut configuration (which would be incorrect), claim 1 is still obvious over the combination of any alleged turn-screw art and Nichols.

### 2. The Cited Art, Its Pertinency, Application To The Subject Claims, And Explanation Why They Raise A Substantial New Question Of Patentability

A substantial new question of patentability is raised where there is a substantial likelihood that a reasonable examiner would consider just one of the prior art patents or printed publications cited above *important* in deciding whether claim 1 of the 562 is patentable. MPEP §2242. It is not necessary that the art establish a *prima facia* case of unpatentability; a substantial new question can be raised even if the Examiner would not necessarily reject the claims as fully anticipated or obvious in view of the art.[25]

Here, there is not merely one piece of prior art that raises a substantial new question. Rather, there are twelve pieces of new prior art and over thirty combinations of these prior art references that raise many substantial new questions of patentability.

The art discussed above raises substantial new questions of patentability for several reasons. First, a reasonable examiner would consider each of the twelve references and various reference combinations important because (i) they are more relevant than the art that was considered during the Examination of the 562 patent; and (ii) they cure whatever

---

24 Dr. Durfee's sworn and signed deposition testimony is equivalent to if not the same a as a declaration which explains "the content" of "prior patents" (*i.e.*, Nichols and the art cited herein). Thus, it may be considered during this reexamination proceeding (MPEP §2258).

25 If any of the patents or publications is considered important, then a substantial new question of patentability is raised unless the same question has been decided in a final holding of a Federal Court or by the patent office in a previous examination. MPEP §2242. Here, there has been no final holding by a Federal Court based on any of the cited art and the cited art was not considered during the prosecution of the 562 patent.

deficiencies were present in the prior obviousness rejections over combinations of one or more of Berlin, Menzies, Green and/or Upton.

In particular, at least six of the references anticipate claim 1, and there is no need to combine references as was done in the final rejection. Moreover, there is motivation to combine references to form the claimed invention. Further, the newly cited prior art teaches the prevailing use of axially aligned stepper motors, lead screws, pistons, and chambers throughout the relevant art, which the 562 patent touts as its invention in its specification (Ex. A at 2:22-28; 33-36; 40-46; 5:43-53). In contrast, of the four references applied during prosecution, only one, Menzies, described a stepper motor drive system. Moreover, the prior art discussed above is analogous art.[26] Thus, the highly relevant art cited above cure the deficiencies in the prior art teachings that were alleged during prosecution.

Requester has more than met its burden of showing a substantial new question of patentability. Although Requester was not required to present a *prima facia* case of unpatentability, it has set forth six anticipatory references and multiple *prima facia* instances of obviousness. Thus, multiple substantial new questions of patentability have been raised. There is simply nothing new about claim 1 of the 562 patent.[27]

---

[26] Although the 562 patent applicant repeatedly argued that the art relied upon by the Examiner was non-analogous, his arguments were erroneous. The pump claimed by the 562 patent is not limited to any particular application, and therefore there is no legitimate basis for finding any of the cited pump prior art non-analogous.

[27] The patentee may argue that claim 1 is a unique combination of elements. That is false. At least 6 references disclose all of the claim elements. Further, it is beyond dispute that of the claimed features were known. Moreover, the patentee has shown no unexpected results, any benefits other than conclusory puffery, as opposed to test data, or any reason that the alleged "unique" combination of elements is anything more than a combination of obvious design choices (*e.g.*, Appeal Brief at 7, arguing that the claimed pump is capable "of fine gradations in linear movement" but does not claim, much less disclose, any gradations nor provide any data showing what fine gradations his claimed pump provides over the prior art pumps).

## IV. Certificate of Service Of Request

Pursuant to 37 C.F.R. § 1.510(b)(5) Requester certifies that it has served a copy of this request by mail on:

1. Dmitry Volovik, the alleged patent owner of record:

   1764 Montreal Avenue
   St. Paul, MN. 55116

2. Mr. Volovik's attorney, Mr. Thomas Hamlin of Robins, Kaplan, Miller & Ciresi, L.L.P. at:

   Robins, Kaplan, Miller & Ciresi LLP
   2800 LaSalle Plaza
   800 LaSalle Ave.
   Minneapolis, MN. 55402-2015
   612-349-8500

3. Mr. Gerald Helget, the attorney, for the last owner of record.

   Briggs and Morgan PA
   80 S Eighth St
   2200 IDS Center
   Minneapolis MN US 55402
   612-334-8480

An extra copy of the request is also enclosed for service by the patent office if needed.

Date: 2/18/04

John Paolino
Attorney for Bayer Healthcare, L.L.C.
(Reg. No. 40,340)

Sheet 1 of 1

| Form PTO-1449 Modified<br>37 CFR 1.501<br>INFORMATION DISCLOSURE CITATION IN A PATENT<br>(Use several sheets if necessary)<br>U.S. Department of Commerce<br>Patent and Trademark Office | Docket No. | Patent No.<br>5,540,562 |
|---|---|---|
| | Applicant<br>Bayer Healthcare, L.L.C. | |
| | Filing Date<br>February 13, 2004 | Group |

**OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)**

| | | |
|---|---|---|
| | 1 | Alexander H. Slocum, Precision Machine Design, (1992), pp. 705-733. |
| | 2 | |
| | 3 | |
| | 4 | |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |

| EXAMINER | DATE CONSIDERED |
|---|---|

© 2004 WW